50 Cal.4th 263 (2010)
THE PEOPLE, Plaintiff and Respondent,
v.
NATHAN VERDUGO, Defendant and Appellant.
No. S083904.
Supreme Court of California.
August 2, 2010.
*268 John F. Schuck, under appointment by the Supreme Court, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka, John R. Gorey and David C. Cook, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
KENNARD, J.
Defendant Nathan Verdugo was convicted of the first degree murders of Yolanda Navarro and Richard Rodriguez. (Pen. Code, §§ 187, 189.)[1] The jury also found true the multiple-murder special-circumstance allegation, as well as allegations that defendant personally used a firearm, i.e., a shotgun, in each crime. (§§ 190.2, subd. (a)(3), 12022.5, former subd. (a).) At the penalty phase, it returned a death verdict, and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).) We affirm the judgment.

*269 I. FACTUAL BACKGROUND

A. Guilt Phase

1. Prosecution evidence

a. Events on October 22 and 23, 1994

On October 22, 1994, defendant went to a Halloween party at the home of Hector Casas in the Glassell Park neighborhood of Los Angeles. The party was well attended, and guests included Lisa Ruvalcaba, Raymond Muro, Paul Escoto, defendant's friend Michael (Mike) Arevalo, and victims Rodriguez and Navarro. Defendant wore wire-rimmed glasses and drove a black Honda CRX, which had tinted windows and a loud exhaust system.
At one point Lisa Ruvalcabawho resembled victim Yolanda Navarro attacked Michael Arevalo, hitting him in the face with a beer bottle. Arevalo, who was bleeding and enraged, yelled, "Fucking bitch." He had to be restrained from retaliating by a group of approximately seven people. Someone in the group yelled, "Shoot the bitch." Arevalo was taken to the hospital, where he received over 50 stitches.
After the attack, defendant left the party and ran to his car. Raymond Muro followed. Defendant opened his trunk and showed Muro a pump-action shotgun with a pistol grip. Defendant told Muro he was going to "get that girl" or "get those people." Muro responded, "just calm down, . . . there is no need for that." Defendant then put the shotgun away, and he and Muro returned to the party.
Rodriguez and Navarro left the party in Rodriguez's burgundy Honda Civic. Another car, resembling defendant's black Honda CRX, pulled out and followed them.
About 2:00 a.m., Alex Quintana of the Los Angeles Fire Department heard voices and someone running outside the window of the fire station at Huntington Drive and Monterey Road. Firefighter Donald Jones heard an argument. Quintana then heard what sounded like a shotgun blast. About 10 seconds later he heard a second shotgun blast, and three to five seconds after that a third blast. Quintana then heard a woman "begging for her life." She said: "No, no, please don't do it. Please, please, don't." Quintana heard another shotgun blast. He looked out of the window and saw a man "standing over the girl holding a shotgun" six to 12 inches from the woman's head. The woman was facedown, lying on her side on the sidewalk. The man inserted *270 another round into the chamber of the shotgun, which Quintana identified by sound as a "pump action." The man then shot the woman in the head.
Firefighter Jones saw the gunman, who he said looked like defendant, run to a car with a louvered rear window. Firefighter Quintana saw a black Honda with tinted windows and a loud exhaust system "come out from around the fence and head north."
The firefighters left the station. They found two bodies: the woman whose death Quintana had witnessed (later identified as Navarro) and a man (later identified as Rodriguez). Rodriguez's car was parked, but it was still running, with its lights on. It had sustained collision damage. About a car's length behind this vehicle, firefighter Jones found a pair of wire-rimmed eyeglasses on the ground. The lenses in these glasses matched a prescription defendant had received about a year earlier. Also found in the area were five 12-gauge Fiocchi shotgun shells. There were skid marks behind the vehicle, and the distance between the skid marks matched the wheelbase on defendant's Honda CRX. The marks had been made by a front-wheel-drive car such as defendant's.
The firefighters blocked the streets with their fire engines. As they did so, Jonathan Rodriguez[2] arrived at the scene and told firefighters that he thought the deceased woman on the sidewalk was his sister. Firefighter Quintana questioned his identification because part of the woman's face was missing. Jonathan called his mother from the fire station and asked her to page his sister. A pager lying next to the woman began vibrating.
The autopsies showed that Navarro and Rodriguez died from gunshot wounds to the head, inflicted by a weapon held two to four feet away. Navarro suffered a single gunshot wound. Rodriguez suffered a gunshot wound to the head and three gunshot wounds to his foot and leg; the latter were consistent with being shot while attempting to run away. Toxicology analysis of Rodriguez's blood did not show the presence of alcohol or drugs.
Michael Arevalo was discharged from the hospital between 2:20 and 2:40 a.m. on October 23. He was taken back to Hector Casas's house. Arevalo, Arevalo's father, Arevalo's father's girlfriend, and Raymond Muro then drove to Muro's house, which was located directly in front of Arevalo's father's house. As they pulled into the carport, Muro saw defendant. Muro heard defendant tell Arevalo that "the situation had been handled," and Arevalo and defendant embraced. Defendant spent the night at Muro's house.
*271 In the morning, defendant, Arevalo, and Muro went out to breakfast. Defendant was wearing sunglasses that were different from the wire-rimmed glasses he had worn to the party the night before. While they were at the restaurant, Arevalo's mother arrived and spoke with Arevalo privately, telling him about the double homicide. When Arevalo returned to the table, he relayed this information to defendant and Muro.

b. Defendant's statements

Donna Tucker, who was married to defendant's brother Michael, had known defendant since he was three years old. In the summer or fall of 1993, defendant told Tucker that he and Arevalo were like brothers and that they would do anything for one another.
On October 23, 1994, in the morning of the murders, defendant called Tucker, who lived about a quarter of a mile from the murder scene. Defendant excitedly asked Tucker: "Did you hear the shots in the neighborhood? My friend Mikey told me that there were shots fired in your neighborhood." Sometime between October 23 and November 2, Tucker asked defendant to help move items out of storage to her house. Defendant refused, saying he could not "come into the area" because "[i]t was too dangerous."
Tucker testified that on November 2, 1994, defendant was working with Tucker and his brother Michael Verdugo at a construction site in Van Nuys. Tucker let defendant use the phone to return a page from his brother Paul. Paul told defendant that the police wanted to speak with him about a fight at a party. Defendant then called the police.
During this telephone conversation, Tucker heard defendant say that he had left the party early and had not seen a fight. He said that he was calling from Las Vegas, where he was working on a construction site, and that he could not give his address or telephone number. Detective Andrew Teague of the Los Angeles Police Department testified about the same telephone conversation. He said that he received a call from defendant, who said he was living in Las Vegas and working for "TG&E Construction Company." Defendant sounded nervous during the conversation and refused to give Teague his address or telephone number.
After defendant completed the telephone conversation, he told Tucker that on his way to Magic Mountain he "killed two guys." He said the homicides occurred after he left a party. Gang members chased his car and crashed into him at Huntington Drive and Monterey Road. Then a man with tattoos from "head to toe" shot at him. Defendant said he shot the man because it "was him or me." He said there was "a girl" with the man, and he "shot her *272 because she saw everything." Defendant said that the police would be after him and that he was going to flee.
On November 9 or 10, 1994, Tucker and defendant met so she could return some equipment from the November 2 construction job. Defendant told Tucker that he could not go to her neighborhood, so they met in a Bank of America parking lot in South Pasadena. At this meeting, defendant said that the police and the Federal Bureau of Investigation were after him, and he kept looking around. Tucker showed defendant a newspaper story about the murders. She asked him, "Is this the one you were talking about?" Defendant read the article and replied, "Yeah, that's the one," but he added, "that's not the way it happened." He then gave a description of the killings that was similar to the one he had given on November 2 and said about the killings that "he got a rush off of that, that it felt really good." During this conversation, defendant was smiling and seemed excited. Defendant said that his brother Paul helped him get rid of his bloody clothes and the shotgun.
At some point before defendant was arrested, Tucker showed him a different newspaper article about the murders and asked him if he had committed them. Defendant said he had. Tucker asked him whether he was sorry, and he said he was not. Defendant said that the firefighters "in the upper floors saw him, that his fingerprints were on the shotgun shells, [and that] they had his eyeglasses." He also said that, contrary to what the newspaper article said, there was no traffic at the time of the murders. Defendant told Tucker that he had been in Mexico, but was forced to return when a local newspaper "show[ed] him with a beard." Defendant then wrote a letter to his sister Pauline, which Tucker agreed to send. Defendant, who was shaking, wrote that he was sorry for what he had done, that things did not look good for him, and that he would wait to see her.
Tucker subsequently received another letter that defendant had written to Pauline, postmarked April 14, 1995. In the letter, defendant said: "The [p]olice have shotgun sh[e]lls that have my prints on them and a pair of glass[es] that I have on in the photo." He also enclosed a copy of a newspaper article about the murders.
A relative of defendant's, Juan Carlos Enciso, made a tape-recorded statement to police on December 15, 1994. This statement was played for the jury. Enciso told police that defendant had told him during the first week of November 1994 that he had recently "bl[o]w[n] away" two people. Defendant claimed there had been a chase on the freeway, that the people chasing him were shooting at him, and that he had to kill them or be killed.
In addition, Detective Teague and Detective Charles Markel of the Los Angeles Police Department testified about an untaped interview with Enciso. *273 Enciso said that defendant had told him that his Honda CRX had "crashed" during the shooting incident and that it needed to be repaired.
At the time of his arrest, defendant was carrying a letter he had written to his sister Pauline, telling her to "[b]urn all paper from me."

c. Other evidence linking defendant to the murders

In November or December 1994, defendant, defendant's uncle Daniel Cuevas, and defendant's brother Paul Verdugo took defendant's Honda CRX to a shop to be painted yellow. After the painting was completed, the shop called Cuevas four or five times, and he in turn contacted defendant's brother Paul, but the car was never picked up. On April 15, 1995, police located and impounded the vehicle.
The murder weapon was not introduced at trial, but the prosecution introduced evidence that on September 19, 1990, defendant purchased two Mossberg 12-gauge shotguns from a Big 5 Sporting Goods store. On April 16, 1992, he reported them stolen to the police. On January 17, 1993, police recovered one of the shotguns, which had a pump action, and on January 28, 1993, they released it to defendant.
Defendant was arrested on April 27, 1995. He was found hiding in a secret compartment behind the linen closet in his father's home.

2. Defense evidence

Defendant testified that he was born on September 5, 1972, and had no criminal record. He completed the 10th grade in high school. He denied murdering Navarro and Rodriguez and claimed that Raymond Muro and Paul Escoto had committed the murders.
Defendant testified that in February 1994 he was stabbed, and his Honda CRX was damaged. After this incident, he began carrying a shotgun in his car.
Defendant admitted that Arevalo was a good friend but, contrary to the prosecutor's assertion, defendant denied Arevalo was as "close as being a brother" or that defendant "would do anything for him." Although defendant had known Arevalo as a child, they had become friends less than a year before defendant was stabbed.
Defendant testified that he and Arevalo attended the Halloween party on the night of the murders, at which Arevalo was hit with a bottle. Defendant *274 was in the kitchen at the time, and Arevalo was outside. Defendant did not see Arevalo after he was hit, and defendant left the party because he did not want to get involved. He found the driver's door to his car open and noticed that his shotgun and a jacket were missing. Also missing was a key to his vehicle, which he said he had hidden under the fender. A pair of defendant's eyeglasses, similar to the ones he had worn that night, were in the missing jacket. Defendant testified that he had shown the hidden car key to several individuals, including Arevalo, Muro, and Escoto.
Defendant stated that he returned to the party after discovering his car open and the items missing. Defendant believed that Arevalo had taken the shotgun, because Arevalo knew about the hidden key and had taken defendant's shotgun out of the car on another occasion. In addition, he heard Arevalo shout at the party: "Fuck you, bitch. You're going to get it." Defendant could not locate Arevalo at the party and went to Arevalo's father's house looking for him. On cross-examination, defendant said that Arevalo arrived at the house shortly after defendant,[3] accompanied by his father, his father's girlfriend, and Muro. He said that Muro was "jittery." Defendant spent the night at Muro's house. He said that Muro acted nervous, could not sleep, and drank heavily.
Defendant testified that later the same morning, defendant, Arevalo, and Muro went out to breakfast. Arevalo's mother arrived, and Arevalo left the restaurant to speak with her. Defendant told Muro that he believed Arevalo had taken defendant's shotgun, and Muro said: "No. Me and Paul did." Muro also said he and Escoto "took care of things." Defendant asked Muro what he meant, and Muro, who had been a marine, said that "his training paid off." Defendant then said: "I don't care what you did. I just want my gun back."
Defendant testified that he did not report the shotgun theft to law enforcement officials because he was concerned about the risk to his family. He lied to Detective Teague about being in Las Vegas, because he did not want to get involved regarding the events that had taken place at the Halloween party. He said that his family had to move after he was stabbed, implying that he lied because he did not want to go through a similar situation again. Defendant said that he was afraid Arevalo and his friends would hurt defendant and his family.
*275 Defendant testified that he fled when he learned he was a suspect in the murders. He changed his appearance, used aliases, and stayed in motels. He said that he lost the wire-rimmed glasses he had worn to the Halloween party.
Defendant admitted that he lied to police during an interview after his arrest. He testified: "I'm a liar, a storyteller, but I'm not no killer."
Defendant also testified that he never got along with Donna Tucker. He said that he never spoke with Tucker and that she had lied when she testified about conversations between herself and defendant after the murders.
Defendant discussed defense exhibit B, which was a pair of eyeglasses. He said that they resembled, but were not, the pair of eyeglasses that he wore to the Halloween party. Defendant explained that he asked someone to purchase the exhibit B eyeglasses while he was in jail and then falsely informed his attorney that they were the glasses he had worn to the party.[4] He said he lied about the eyeglasses because others had lied. Defendant said: "I panicked, felt like I was being framed, no one was going to believe me, that I lost the glasses, so I had those purchased."
Mary Alice Baldwin, defendant's sister, testified that defendant was born in Pasadena. Their mother died in 1982, when defendant was a boy, and Baldwin, who was 15 years older than defendant, assumed a maternal role in his life. Baldwin testified that defendant had a learning disability that affected his comprehension of English and his ability to spell.
Baldwin further testified that defendant told her around Thanksgiving 1994 that "Ray" and "Paul" had committed the murders after taking defendant's shotgun. They had also threatened to kill defendant, and defendant feared they would kill his family. Baldwin further testified that defendant's Honda CRX did not have louvers on the back window.
The defense also presented expert testimony describing the effect to a human head when it receives a shotgun wound at close range.

3. Prosecution rebuttal evidence

Mary Alice Baldwin, defendant's sister, testified about statements defendant had made to her, which she had earlier related to detectives. Defendant *276 had told her of a time when he was driving home on the Long Beach Freeway and "they were shooting at me." Defendant had told her that he tried to get away.
Detective Markel testified about a telephone conversation he had with Baldwin on May 23, 1995, in which she described the statements defendant had made to her. Baldwin told Markel that she had seen defendant about a month earlier. At that time, defendant told her about a time when he was going home on the Long Beach Freeway and certain individuals shot at him and it was either "him or me."
Detective Teague testified that louvers could be applied to the rear window of a car, either by drilling holes into the metal of the vehicle or by using double-sided adhesive. The latter method allowed the louvers to be easily removed, and the glue also could be removed with a solvent.

B. Penalty Phase

1. Prosecution evidence

Relatives of the victims testified about the effect the murders had on their lives. The jury heard testimony from Rodriguez's mother, two cousins, and his aunt and uncle, and also from Navarro's mother, sister, and brother.

2. Defense evidence

William Wright testified that he and defendant had been friends for about 23 years. He met defendant when defendant was between five and seven years old, at which time Wright was 17 or 18 years old. As a child, defendant was quiet, very respectful, and industrious. He was also extremely close to his family. Wright had never seen defendant bully anyone or known him to be violent. Wright did not know any of the details of defendant's crimes. He offered his opinion that prosecution witness Donna Tucker was not a credible person. He also testified that, if defendant were allowed to live, he would be productive in prison.
Michael Verdugo, defendant's brother, testified that he was 12 to 13 years older than defendant. He and defendant were close, as was defendant to other family members. Michael stated that defendant worked for him on construction sites. Defendant followed directions well and was good with his hands. Michael also said that defendant avoided criminal street gangs.
Mary Alice Baldwin, defendant's sister, testified that she was 23 and defendant was seven when their mother died. After his mother's death, *277 defendant became quieter and grew closer to Mary Alice. She testified that defendant had difficulty understanding his schoolwork and, in particular, learning to spell. She also stated that defendant was always very helpful, loving, and friendly. She did not believe he was guilty of the murders.

II. DISCUSSION

A. Guilt Phase Issues

1. Denial of Keenan counsel

Defendant, who was represented by retained counsel, contends that the trial court erred under state law by refusing to appoint Keenan counsel and that the error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7 and 15 through 17, of the California Constitution.[5] (See Keenan v. Superior Court (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108] (Keenan) [trial court has discretion under statutes governing appointment of counsel to appoint a second attorney to assist in the defense of a capital case].) We disagree.
Defendant was represented by retained counsel George Hernandez. Before trial, he filed a confidential application for Robert Beswick to be appointed as second counsel under section 987, subdivision (d). The trial court denied the motion for second counsel, stating (1) that "[t]here is nothing presented to this Court that would indicate the agreement between defendant and counsel was for anything less than full representation of the defendant during all proceedings," and (2) that Hernandez's declaration was "insufficient" in that "[t]here appear to be neither specific facts nor complexity of issues that require such appointment."
Section 987, subdivision (d), provides in relevant part: "In a capital case, the court may appoint an additional attorney as a cocounsel upon a written request of the first attorney appointed. The request shall be supported by an *278 affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed." Even assuming without deciding that section 987, subdivision (d), authorized the trial court here to appoint second counsel, the trial court did not abuse its discretion in finding Defense Counsel Hernandez's declaration insufficient to justify such an appointment.
(1) "`The initial burden . . . is on the defendant to present a specific factual showing as to why the appointment of a second attorney is necessary to his defense against the capital charges.' (People v. Lucky (1988) 45 Cal.3d 259, 279 [247 Cal.Rptr. 1, 753 P.2d 1052].) An `abstract assertion' regarding the burden on defense counsel `cannot be used as a substitute for a showing of genuine need.' (Id. at p. 280; People v. Jackson (1980) 28 Cal.3d 264, 287 [168 Cal.Rptr. 603, 618 P.2d 149] [no abuse of discretion in denying application for second counsel when counsel merely relied on the circumstances surrounding the case].)" (People v. Staten (2000) 24 Cal.4th 434, 447 [101 Cal.Rptr.2d 213, 11 P.3d 968] (Staten).) In addition, "`[t]he appointment of a second counsel in a capital case is not an absolute right protected by either the state or the federal Constitution.'" (People v. Lancaster (2007) 41 Cal.4th 50, 71 [58 Cal.Rptr.3d 608, 158 P.3d 157].) We review the trial court's decision denying a request to appoint second counsel for abuse of discretion. (People v. Roldan (2005) 35 Cal.4th 646, 688 [27 Cal.Rptr.3d 360, 110 P.3d 289] (Roldan).)
Here, in his declaration, Hernandez stated that the "facts and issues involved in this case are sufficiently complex to necessitate the appointment of second counsel," that counsel anticipated "many lengthy pre-trial motions, hearings and writs," that investigation of the guilt phase would cover "an extensive period extending both before and after the date of the crime," that the penalty issues were "highly involved and complex" and that investigation into these issues should "be commenced without delay." Hernandez also specifically requested the appointment of Robert Beswick, whose "defense talents compl[e]ment my skills, . . . his strengths offset my weaknesses, and . . . his perceptions of evidence and tactics are sufficiently divergent from my own to provide both a broader and more objective viewpoint from which to make defense decisions and to formulate trial strategy."
Counsel's declaration did not, however, provide any specific information justifying appointment of second counsel. Thus, unlike in Keenan, on which defendant relies, counsel did not state that he needed to interview more than 100 witnesses, that the case involved complicated scientific and psychiatric testimony, that trial would occur soon after counsel was appointed, or that other criminal cases were pending against defendant and that the prosecution intended to rely on evidence related to those cases here. (See Keenan, supra, 31 Cal.3d at pp. 432-434.) Rather, counsel's declaration is comparable to *279 those we have found inadequate in other cases. (See, e.g., Staten, supra, 24 Cal.4th at p. 447 [the defendant's application consisted of "little more than a bare assertion that second counsel was necessary" and "presented no specific, compelling reasons"].) Nor does our review of the record substantiate defendant's assertion that the case "was extremely complex."
Defendant further contends that he was prejudiced by the denial of his application for appointment of second counsel, because "the instant case was trial counsel's first capital trial" and counsel "lacked the ability to properly object or to conform his conduct to that expected of capital counsel, as evidenced by the innumerable reprimands and sanctions imposed by the trial court." To the extent defendant is arguing that the inexperience of retained counsel in trying capital cases is a sufficient reason for appointment of second counsel, this argument was not presented to the trial court, and hence cannot be raised on appeal. (Roldan, supra, 35 Cal.4th at p. 688, fn. 13.)

2. Alleged failure to disclose Brady and section 1054.1 material

Defendant contends that the prosecution engaged in prejudicial misconduct by failing to disclose material it was required to provide to the defense under Brady v. Maryland (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] (Brady) and section 1054.1. Defendant asserts a violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, article I, sections 7 and 15 through 17 of the California Constitution, and state statutory rights. We disagree.
(2) "Pursuant to Brady, supra, 373 U.S. 83, the prosecution must disclose material exculpatory evidence whether the defendant makes a specific request (id. at p. 87 . . .), a general request, or none at all. . . ." (In re Brown (1998) 17 Cal.4th 873, 879 [72 Cal.Rptr.2d 698, 952 P.2d 715].) "For Brady purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. [Citation.] Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.] Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that Brady was not satisfied is reversible without need for further harmless-error review. [Citation.]" (People v. Zambrano (2007) 41 Cal.4th 1082, 1132-1133 [63 Cal.Rptr.3d 297, 163 P.3d 4] (Zambrano); see also Cone v. Bell (2009) 556 U.S. ___, ___ _ ___ [173 L.Ed.2d 701, 129 S.Ct. 1769, 1782-1783].)
(3) Section 1054.1 (the reciprocal-discovery statute) "independently requires the prosecution to disclose to the defense . . . certain categories of *280 evidence `in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies.'" (Zambrano, supra, 41 Cal.4th at p. 1133.) Evidence subject to disclosure includes "[s]tatements of all defendants" (§ 1054.1, subd. (b)), "[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged" (id., subd. (c)), any "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts" (id., subd. (f)), and "[a]ny exculpatory evidence" (id., subd. (e)). "Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. (§ 1054.7.)" (Zambrano, at p. 1133.)
Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court "may make any order necessary to enforce the provisions" of the statute, "including, but not limited to, immediate disclosure, . . . continuance of the matter, or any other lawful order." (§ 1054.5, subd. (b).) The court may also "advise the jury of any failure or refusal to disclose and of any untimely disclosure." (Ibid.) A violation of section 1054.1 is subject to the harmless-error standard set forth in People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (Zambrano, supra, 41 Cal.4th at p. 1135, fn. 13.)

a. Prosecutor's notes regarding Raymond Muro interview

(1) Factual background

Raymond Muro testified that after the Halloween party, he went home with Arevalo, Arevalo's father, and Arevalo's father's girlfriend. As they pulled into a carport by Muro's house, Muro saw defendant. Arevalo and defendant had a conversation. Without objection, Muro testified that defendant told Arevalo that "the situation had been handled" and that Arevalo and defendant embraced.
After a recess, defense counsel informed the court that he had spoken to the prosecutor about Muro's testimony, asking if defendant's statement "the situation had been handled" was in a written report. The prosecutor told the court that his interview with Muro had taken place a few months earlier and that he had told defense counsel about the statement at that time, either in court or in a telephone conversation. The prosecutor said, "I told him that the only thing different that I recall from the interview was this new statement." The prosecutor added that "the only notes taken of the interview were notes that I took myself that I have combined with questions that I have been *281 asking the witness in court." The trial court ordered the prosecutor to give defense counsel a copy of these notes, after redacting any attorney work product. The prosecutor agreed to do so.
Defense counsel suggested that the court had a "couple of remedies" for the discovery violation, one of which was to strike the statement. The court said it did not see any harm to defendant from failure to disclose the notes, because the prosecutor had told defense counsel the substance of the statement. Defense counsel said: "[H]e may have, your honor. . . . I don't know if he has anything in his notes where he told me that." The court found no discovery violation, but the court offered to recess until the following afternoon, so that defense counsel would have additional time to prepare for cross-examination. Trial counsel responded, "Short of the court striking the testimony, I would appreciate that very much, your honor."

(2) Analysis

(4) We first conclude that there was no Brady violation. As defendant acknowledges, the statement by defendant that "the situation had been handled" was "exceedingly damaging" to his case. Hence, it was not favorable to the defense and did not fall within the scope of Brady, supra, 373 U.S. at page 87. In addition, Muro testified to the statement. "[E]vidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery." (People v. Morrison (2004) 34 Cal.4th 698, 715 [21 Cal.Rptr.3d 682, 101 P.3d 568] (Morrison).)
Nor does defendant demonstrate prejudice from the prosecutor's violation of section 1054.1. (See Thompson v. Superior Court (1997) 53 Cal.App.4th 480, 485-486, 488 [61 Cal.Rptr.2d 785] [written notes of an interview with an intended trial witness, other than attorney work product, are discoverable as "statements" within the meaning of §§ 1054.1, subd. (f), 1054.3, subd. (a)]; § 1054.7.) The trial court found that the prosecutor told defense counsel about the substance of the statement at the time that it was made. In addition, the trial court stopped the prosecutor's direct examination of Muro and granted a continuance in the proceedings, thus giving defense counsel additional time to prepare for cross-examination. This continuance appears to have been more than adequate to remedy the violation of the discovery statute, and defendant does not attempt to demonstrate otherwise.
Defendant asserts that the "only appropriate sanction would have been to strike the statement," because "[b]y allowing the statement to remain, the trial court perpetuated the great prejudice caused by the statement." Without elaboration, defendant also asserts that he "could not properly or effectively prepare for cross-examination of witnesses," that "his ability to impeach the *282 witness[] was adversely impacted," and that "[t]imely disclosure of the information would have enabled counsel to adjust his theory of the case to fit the facts." Such generalized statements are insufficient to demonstrate prejudice. Defendant does not explain what counsel would have done differently if the notes had been disclosed sooner.

b. Prosecutor's notes regarding John Hernandez interview

(1) Factual background

John Hernandez testified that defendant visited his house in November or December of 1994. After defendant left, Hernandez was stopped on the street by the police and questioned. Hernandez also testified that, when he was interviewed by the prosecutor, the prosecutor took notes. At a sidebar conference, the prosecutor denied taking notes of the interview.
The morning after Hernandez's testimony, the prosecutor told defense counsel that he had in fact taken notes of the Hernandez interview. The notes referred to Hernandez's arrests for felony driving while under the influence and assault on a police officer, his employer's telephone number, and a comment by Hernandez that licensed professionals are liars. Hernandez had also told the prosecutor that he had been not only arrested for driving under the influence, but also convicted of that offense, but the prosecutor was not certain this additional information was in the notes.
Defendant moved for a mistrial based on the prosecution's previous representation that he had not taken notes of this interview. The court implicitly denied the motion, stating that the proper sanction was to allow defendant to call Hernandez back to testify further. Hernandez was not recalled.

(2) Analysis

First, we find no Brady violation. There was no reasonable probability that disclosure of the information in the notes "would have altered the trial result" (Zambrano, supra, 41 Cal.4th at p. 1132), and therefore the notes were not "material" for purposes of Brady disclosure. The testimony that defendant was at Hernandez's house was apparently introduced by the prosecution to demonstrate that defendant had fled. Even assuming Hernandez could have been impeached with the information in the notes, there was overwhelming evidence, including defendant's own statements, that he fled. Moreover, the information was disclosed at trial, and hence was not suppressed for Brady purposes. (Morrison, supra, 34 Cal.4th at p. 715.)
*283 Second, we reject defendant's assertion that the proper sanction for the statutory discovery violation was a declaration of mistrial. Defendant fails to demonstrate why the opportunity to re-call Hernandez for further cross-examination did not cure any harm.

c. Donna Tucker's oral statement that she was threatened

At a sidebar conference during the trial, the prosecutor represented that Detective Teague would testify that the Verdugo family had threatened Donna Tucker's life. Defendant objected that Tucker's oral statement to Teague should have been disclosed to the defense. The trial court ruled that oral statements not made by a defendant did not need to be disclosed. On hearsay grounds, the court barred Detective Teague from testifying about Tucker's statement, but the court permitted Tucker to testify about any threats made against her. Nearly a week later, Tucker testified that Salvador Verdugo, defendant's father, had threatened her, urging her to "keep quiet."
To the extent defendant contends that failure to disclose Tucker's oral statement to Detective Teague violated Brady, it is not clear such evidence was favorable to the defense. The fact that defendant's family threatened Tucker hardly proves defendant's innocence. Defendant argues that the evidence went to Tucker's credibility, which is true, but it tended to show that Tucker might have a reason to minimize defendant's culpability, not a reason to exaggerate his culpability. It is hard to see how the defense could have used this evidence to its advantage. In any event, the statement was disclosed at trial, and hence was not suppressed for Brady purposes. (Morrison, supra, 34 Cal.4th at p. 715.)
We need not decide whether oral statements that are neither made by a defendant nor exculpatory must be disclosed under section 1054.1, subdivision (f), because, even assuming a discovery violation, defendant fails to demonstrate prejudice. Tucker did not testify concerning any threat against her until nearly a week later. Therefore, defense counsel had ample time to prepare a cross-examination of Tucker on this point. Defendant does not state specifically what counsel would have done differently if Tucker's oral statement had been disclosed sooner.

d. Prosecutor's notes regarding Donna Tucker's statements

Firefighter Donald Jones testified that he saw the killer run to a car that had louvers on the rear window. When defendant's Honda CRX was recovered by police in April 1995, it did not have louvers. Donna Tucker testified that defendant had past experience doing minor bodywork on cars and that before the double homicide his Honda CRX had louvers on the rear window.
*284 At a sidebar conference, defense counsel stated that the prosecution had not met its disclosure obligations with respect to Tucker's statements. That morning, the prosecutor had given defense counsel notes of an interview conducted with Tucker about a week earlier. The notes included the phrase "louvers on windows." The trial court found the discovery violation "trivial," although "unprofessional." It denied defendant's motion for a mistrial, but invited defense counsel to file a motion for a continuance. It further observed that it would allow Tucker to be re-called for further cross-examination regarding the louvers if defendant's investigation uncovered additional evidence.
Defendant concedes the evidence was not favorable to the defense. Therefore, he cannot establish a Brady violation. There was, however, a violation of the reciprocal-discovery statute, under which the prosecutor was required to immediately disclose his notes regarding Tucker's statement. (§§ 1054.1, subd. (f), 1054.7.) Nevertheless, no prejudice is apparent. The trial court permitted defendant to move for a continuance and, if necessary, to re-call Tucker for further cross-examination. Defendant does not explain why these remedies were inadequate.

e. Disclosure of Donna Tucker's relocation

After trial, the prosecutor disclosed that his office had assisted Donna Tucker in relocating to a new home, including paying some of Tucker's rent. In a new trial motion, defendant unsuccessfully argued that the prosecutor's posttrial disclosure of this assistance violated Brady.[6] He renews that contention here.
In January 1996, before trial began, Kevin McCormick, the former prosecutor on the case, sought and received an ex parte order for relocation expenses for Donna Tucker not to exceed $1,318.[7] In a declaration in support of the motion, McCormick stated that "Abe Verdugo, the defendant['s] uncle told Ms. [Tucker], prior to the defendant being arrested, that he knew someone was `snitching' and he would take care of it when he found out who it was." The declaration also stated that Abe Verdugo began carrying a handgun shortly after defendant was profiled on a television program for wanted criminals. Tucker testified at the preliminary hearing, which was attended by Abe Verdugo and other members of the Verdugo family. *285 McCormick's declaration further stated: "[D]efendant maintains [an] alliance with a local criminal street gang. Ms. [Tucker] is fearful of the associates of the defendant who know not only her, but also her family and friends." The declaration continued: "Donna [Tucker] has sought to move out of town under an assumed name but has had difficulty due to financial restraints, local job responsibilities and the reluctance of apartment managers to permit relocation under a name other than her own. Ms. [Tucker] remains fearful of being seriously injured by associates of the defendant or his relatives as a result of coming forward with critical information in this case." At the hearing on defendant's new trial motion, McCormick confirmed that Tucker had told him she was fearful that defendant would have her killed if she did not move to a new location.
No Brady error is apparent. Defendant contends the information was favorable to the defense to the extent it could have been used to undermine Tucker's credibility (by demonstrating the benefits she was receiving for her cooperation with the prosecution). Whether the information, as a whole, was favorable to defendant is far from clear. But even assuming some of the information (such as the financial assistance Tucker received), in isolation, could be considered favorable to defendant, there is no "reasonable probability its disclosure would have altered the trial result." (Zambrano, supra, 41 Cal.4th at p. 1132.) If the defense had attempted to present this evidence at trial in an effort to undermine Tucker's credibility, the prosecution would have been entitled to present evidence explaining the reasons for Tucker's relocation, which were that a member of the Verdugo family had threatened her, that she was fearful that defendant would have her killed unless she moved, and that defendant had ties to a criminal street gang. This rebuttal evidence would have effectively countered the defense assertion that Tucker was benefiting from her cooperation with the prosecution. In fact, Tucker's willingness to testify against defendant despite justifiable concerns about her safety arguably would have enhanced her credibility.
For the same reason, defendant fails to demonstrate prejudice from violation of the reciprocal-discovery statute.

f. Disclosure of Detective Teague's oral statement as to the direction the shooter was facing

(1) Factual background

On cross-examination of Detective Teague at trial, defense counsel asked what direction the assailant was facing when he shot Navarro. Teague replied, "I believe that the shooter was standing near the curb facing the fire station." Counsel then asked if Teague had ever written a report that included that opinion. Teague replied, "I don't believe I ever used those exact terms, no, *286 sir." Nevertheless, Teague believed that he had orally informed the district attorney of his opinion in December 1994.
Later, outside the presence of the jury, defense counsel asserted that before Teague's testimony, "everything that we had before us" indicated "that the shooter was facing away from" the firefighters. He further asserted that the prosecutor's failure to disclose Teague's oral statement violated section 1054.1, and he sought a mistrial based on prosecutorial misconduct. The trial court found no discovery violation, but said that, "assuming there is some violation here," he would allow the defense to re-call Teague for further cross-examination on the issue. The court also observed that the defense would have three to four days, including a weekend, to consult with an expert before the prosecution completed its case-in-chief. The court said: "[I]f there is really a problem here, . . . then I'll let you revisit it."

(2) Analysis

We find no Brady violation. Defendant does not explain how Teague's opinion about the direction the shooter was facing was favorable to the defense. (Zambrano, supra, 41 Cal.4th at p. 1132.) Moreover, Teague's opinion was disclosed at trial, and hence was not suppressed for Brady purposes. (Morrison, supra, 34 Cal.4th at p. 715.) Nor was there prejudice from any reciprocal-discovery statute violation. Defendant does not explain why the trial court's remedy of allowing the defense to re-call Teague for further cross-examination was inadequate.

g. Disclosure of notes recording the measurement of Paul Escoto's car

(1) Factual background

The defense contended that Paul Escoto, who had a car similar in certain respects to defendant's car, could have been the shooter.
On June 6, 1997, Detective Teague testified that he believed marks on the street at the murder scene were acceleration marks created by a front-wheel-drive vehicle. Defendant's Honda CRX was a front-wheel-drive vehicle, but Teague could not recall if he had ever examined Escoto's car to determine whether it also was a front-wheel-drive vehicle.
On June 10, 1997, Detective Markel testified that the acceleration marks on the street at the murder scene measured four feet nine inches apart, matching the wheelbase of the front wheels on defendant's car. Detective Teague testified that on June 7 he examined Escoto's car and determined that it was a *287 rear-wheel-drive vehicle with a wheelbase of four feet six inches. At a sidebar conference, the defense argued that the prosecution had failed to disclose Teague's notes recording the measurements of Escoto's car. The prosecutor said that he had received Teague's notes that morning and had left a copy of the notes on defense counsel's table in the courtroom "right when we walked in." Defense counsel was unaware the notes were there.
The court stated that it did not know how the prosecutor could have produced the notes to the defense any sooner than he had, but the court further stated that defendant would be permitted to defer cross-examination of Teague on this issue. Defendant moved for a mistrial, which the trial court denied.

(2) Analysis

No Brady error occurred, because Teague's measurements of Escoto's car were not favorable to the defense and were disclosed at trial. (Zambrano, supra, 41 Cal.4th at p. 1132; Morrison, supra, 34 Cal.4th at p. 715.)
Nor was there any violation of the reciprocal-discovery statute. The prosecutor produced the notes to the defense the same morning that he received them, which satisfies the statutory requirement of immediate disclosure of materials that become known during trial. (§ 1054.7; see People v. DePriest (2007) 42 Cal.4th 1, 37-38 [63 Cal.Rptr.3d 896, 163 P.3d 896] [disclosure of evidence the morning after its discovery was timely under § 1054.7].) Although defendant claims he was "taken by surprise and . . . unable to effectively counter this new evidence," the prosecution had no duty to obtain the evidence sooner than it did. (Cf. In re Littlefield (1993) 5 Cal.4th 122, 135 [19 Cal.Rptr.2d 248, 851 P.2d 42].)

h. Disclosure of Detective Walton's opinion

(1) Factual background

On May 30, 1997, Los Angeles Police Detective Charles Walton (who had been involved in the investigation of defendant's case) was sitting on a bench in the hallway outside the courtroom. He was greeted by Defense Attorney George Hernandez, with whom he was acquainted. Hernandez asked Walton about paint transfer on the victim's car and said: "[I]t looks white so it would seem that it came from a white car." Walton replied that counsel's assessment "was possible, but that it could have come from any color car or it could have just been the wax or lacquer transfer from the outer coating, protective coating, of a vehicle or any number of colors which may have changed color due to heat and friction of the vehicles rubbing together during the traffic collision."
*288 On June 2, 1997, the court held a hearing outside the presence of the jury to determine whether any discovery violation had occurred in connection with Walton's opinion about paint transfer. Detective Walton testified to the circumstances of his May 30 encounter with defense counsel recounted above. Walton also testified that as part of the investigation of the case, he had examined and made certain measurements of Rodriguez's burgundy Honda Civic and defendant's Honda CRX. He noticed a "whitish color" mark on Rodriguez's Civic and mentioned it to Detective Markel. Markel said: "Don't worry about any paint transfer. We're not interested in that [because] the other car [was] painted after the . . . alleged accident." Walton testified that he wrote a report summarizing his findings, but the report did not include any conclusions regarding the white mark. Walton also testified that he was "not a paint expert." He agreed with defense counsel that the white mark he saw could have been a paint transfer, but he also agreed with the court that he was not sure. The trial court found no discovery violation, because Walton was not qualified to be a paint expert.

(2) Analysis

Defendant contends that if Detective Walton's opinion regarding the white mark on Rodriguez's Civic had been disclosed in a timely manner, defendant might have been able to locate an expert who would have testified that the mark was white paint from a white car. This testimony would have undermined the prosecution's assertion that there was a collision between defendant's car and the victim's car shortly before the murders. We disagree.
Before Walton's discussion with defense counsel, the only statement Walton made about the white mark (orally or in writing) was his comment to Detective Markel that the mark existed. Defense counsel knew, however, long before his hallway conversation with Walton that the mark existed. In his opening statement, defense counsel mentioned the mark and argued that this mark was evidence that defendant's car, which was black at the time of the murder, was not at the murder scene. Nothing prevented defense counsel from retaining an expert to support this argument.
(5) Walton's later statement to defense counsel that the white mark might have come from a car of any color did not prevent defense counsel from continuing to argue the opposite. Walton was neither an expert regarding paint transfer, nor did he testify before the jury regarding the source of the mark. And, in any case, the prosecution cannot be faulted for failing to disclose Walton's nonexpert opinion about the white mark, because there is no evidence that the prosecution knew Walton's opinion. "`Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation *289 for him.'" (Zambrano, supra, 41 Cal.4th at p. 1134.) Accordingly, we conclude there was no Brady or reciprocal-discovery statute violation.

i. Disclosure of expert opinion regarding alleged collision between defendant's and victim's vehicles

In addition to testifying outside the presence of the jury, Detective Walton also testified before the jury as an expert on accident reconstruction. He stated that he had inspected both defendant's Honda CRX and Rodriguez's Honda Civic. As relevant here, he concluded that bodywork had been performed on the CRX.
Defendant moved for a mistrial, contending that the prosecutor failed to disclose Walton's opinion, and therefore his testimony caught the defense by surprise. On the night before Walton's testimony the prosecutor discussed certain photographs of defendant's carwhich had years earlier been provided to the defensewith Walton, and the next morning the prosecutor did not disclose Walton's opinion regarding the photographs to the defense. On that limited basis, the trial court found a discovery violation, but it implicitly denied defendant's mistrial motion. Instead, it offered to allow the defense to defer cross-examination of Walton so that the defense could consult an expert.
Defendant states that "Walton's opinions bolstered the prosecution's claim that [defendant's] CRX was probably the vehicle with which the victim's red car collided." (Italics added.) Because defendant concedes that Walton's opinion was not favorable to the defense, there was no violation of Brady. (Zambrano, supra, 41 Cal.4th at p. 1132.) In addition, the evidence was disclosed at trial, and hence was not suppressed for Brady purposes. (Morrison, supra, 34 Cal.4th at p. 715.)
With regard to the reciprocal-discovery statute, the violation did not prejudice defendant. Defendant makes no attempt to demonstrate, as he must, why the trial court's remedy of deferring cross-examination of Walton was inadequate.

j. Cumulative prejudice

Defendant contends that even if a single failure to disclose evidence does not warrant reversal, the "cumulative prejudice resulting from the prosecution's consistent course of withholding material evidence certainly does." We have concluded that the individual discovery violations were harmless or that any harm could have been fully cured by the remedy the trial court offered. We are troubled by the number of statutory discovery violations that occurred *290 here, but because the harm in each case was nonexistent or could have been fully avoided, we see no possibility of cumulative prejudice.

3. Evidentiary issues

a. Exclusion of evidence regarding allegations that detectives had fabricated evidence in a different case

Defendant contends that the trial court prejudicially erred by excluding evidence that detectives involved in his case had been accused of fabricating evidence in a different case. These detectives were exonerated, but defendant asserts that this evidence would have established the motivation for his own fabrication of evidence. Defendant claims violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7, 15 through 17, and 28, of the California Constitution. We disagree.
About nine months before trial, the prosecutor informed the trial court and defense counsel that, in a different case, Detectives Teague and Markel had been exonerated of charges that they had fabricated evidence. At trial in this case, defense counsel sought permission to present evidence regarding the investigation of Detectives Teague and Markel. Counsel asserted that this evidence would substantiate defendant's explanation for why he had arranged from jail to have a pair of eyeglasses purchased that matched the eyeglasses he wore to the Halloween party. Defendant claimed that he did so because he believed Detectives Teague and Markel were falsely accusing him, and he wanted to refute their false accusations with false evidence of his own. Defense counsel implied that such a motivation would negate any argument that defendant arranged the purchase of the eyeglasses because of a consciousness of guilt.
The trial court pointed out that, as of that time, the evidence related to the purchase of the eyeglasses demonstrated only that defendant's brother and father had fabricated evidence; no evidence tied defendant to their activity. The court said it would instruct the jury that the evidence regarding the purchase of the eyeglasses could not be considered against defendant and could only be used for purposes of considering the credibility of Salvador and Paul Verdugo. The court excluded the evidence regarding the investigation of Detectives Teague and Markel, finding the probative value of that evidence substantially outweighed by the consumption of time and the distraction of exploring a collateral issue. (Evid. Code, § 352.)
No abuse of discretion appears. (People v. Farley (2009) 46 Cal.4th 1053, 1129 [96 Cal.Rptr.3d 191, 210 P.3d 361] (Farley).) Even assuming that the *291 evidence of the allegations against Detectives Teague and Markel was relevant, the trial court reasonably excluded it under Evidence Code section 352. This is especially so considering that the detectives had been exonerated of fabricating evidence by the time defendant's trial began and the prosecution would then have been entitled to bring that point to the attention of the jury. The result would have been a lengthy evidentiary detour into a matter that was only marginally relevant and might well have confused the jury.
Defendant later testified that he lied to his attorney about the eyeglasses his brother and father had obtained (claiming they were the same eyeglasses he had worn to the Halloween party) to counter the lies of Donna Tucker and Detective Teague. Defendant said: "I panicked, felt like I was being framed, no one was going to believe me, that I lost the glasses, so I had those purchased." Thus, the jury heard defendant's explanation for why he arranged for the purchase of the glasses; the additional evidence that Detectives Teague and Markel had been accused of, and exonerated of, fabricating evidence in an unrelated case would have done little to substantiate this explanation.

b. Exclusion of evidence of Donna Tucker's need for psychiatric care

Defendant contends the trial court erred when it precluded defendant from presenting evidence that Donna Tucker had received psychiatric care. We disagree.

(1) Factual background

As noted, Donna Tucker, who was married to defendant's brother Michael Verdugo, testified for the prosecution. Between the time of the murders and the time of trial, Tucker and Michael divorced. The defense case included an effort to discredit Tucker. On direct examination, defendant's sister, Mary Alice Baldwin, testified that she had known Tucker since 1973. Defense counsel asked, "Did you ever think that Donna was not mentally stable?" The trial court sustained the prosecutor's relevance objection. Defense counsel then inquired, "Well, from your observations, did you ever see anything about her that you thought was unusual?" The trial court again sustained the prosecutor's relevance objection.
At a sidebar conference, defense counsel asserted that Tucker had been admitted to a psychiatric hospital approximately three months earlier. Counsel said he had learned this information the night before from Michael Verdugo, who said he was "paying the psychiatric bills and hospital bills as part of the divorce settlement." The prosecutor told the court that he had no knowledge regarding these assertions.
*292 The trial court observed that receipt of psychiatric care "does not necessarily reflect on" credibility and that counseling is common for individuals who are going through a divorce. Defense counsel sought permission to question Baldwin as to whether Tucker had had any previous episodes of unusual laughing and crying, noting that Tucker had laughed and cried during her testimony. The court found the evidence would require a collateral inquiry into the circumstances under which Tucker had previously laughed and cried. It also found the evidence irrelevant, because Baldwin was not an expert on mental health and not qualified to give an opinion as to whether the laughing and crying was an expression of normal emotion or a sign of mental illness. The court noted that Tucker's hospital bills "could be some kind of out-patient counseling for the stress of the divorce" and concluded: "[A]s you present it to me right now, it's too vague and general. You're going to have to get specific with a witness that's qualified. That's all I'm telling you."

(2) Analysis

(6) "[T]he mental illness or emotional instability of a witness can be relevant on the issue of credibility . . . if such illness affects the witness's ability to perceive, recall or describe the events in question." (People v. Gurule (2002) 28 Cal.4th 557, 591-592 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Here, however, there was no evidence Baldwin was familiar with any hospitalization or other treatment.
The trial court also acted within its discretion in precluding testimony with regard to whether Tucker had had previous episodes of unusual laughing and crying. This testimony would have required significant collateral inquiry into the circumstances that gave rise in each case to the emotional reaction being described. (Evid. Code, § 352; see Farley, supra, 46 Cal.4th at p. 1129.)
Defendant further contends that he should have been allowed to re-call Tucker as a witness. Although defense counsel made a fleeting reference to bringing Tucker back for further cross-examination, the thrust of the sidebar conference was whether defendant could ask Baldwin questions about Tucker's mental state. Defense counsel did not re-call Tucker, and he points to no place in the record where he requested to do so and was refused permission.[8] The trial court did not abuse its discretion.

*293 4. Alleged instructional error

a. Failure to instruct on voluntary manslaughter as to Richard Rodriguez

There was evidence that the Halloween attack on Michael Arevalo by a female party guest provoked defendant, and that when defendant killed Yolanda Navarro, he erroneously believed he was killing Arevalo's attacker. There was no evidence, however, that a male party guest was involved in the attack on Arevalo. Therefore, with regard to Yolanda Navarro, the trial court instructed the jury on voluntary manslaughter as a lesser included offense to murder, but the court gave no similar instruction with regard to Richard Rodriguez. Defendant claims violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7 and 15 through 17, of the California Constitution. We find no error.
(7) "`"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request."' [Citation.] `Conversely, even on request, the court "has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction."' [Citation.] This substantial evidence requirement is not satisfied by `"any evidence . . . no matter how weak,"' but rather by evidence from which a jury composed of reasonable persons could conclude `that the lesser offense, but not the greater, was committed.' [Citation.] `On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense.' [Citation.]" (People v. Avila (2009) 46 Cal.4th 680, 704-705 [94 Cal.Rptr.3d 699, 208 P.3d 634] (Avila).)
(8) "`Manslaughter, an unlawful killing without malice, is a lesser included offense of murder.' [Citations.] `Although section 192, subdivision (a), refers to "sudden quarrel or heat of passion," the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation.' [Citations.] `The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' [Citation.] `[T]he victim must taunt the defendant or otherwise initiate the provocation.' [Citations.] The `"heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances . . . ."' [Citation.]" (Avila, supra, 46 Cal.4th at p. 705.)
Here, the jury was instructed on first and second degree murder for both victims, and voluntary manslaughter as to Yolanda Navarro. Defendant *294 requested voluntary manslaughter instructions as to Richard Rodriguez, but the trial court refused, stating: "I can't figure out any way [defendant] could have mistakenly believed that the male victim was responsible for [the assault on Arevalo]." The court continued: "I've pointed out pretty slim evidence even on the female. . . . But there is . . . absolutely nothing to lead me to see any kind of substantial evidence supporting a mistaken belief about the male."
On appeal, defendant contends that the alleged collision between his car and the victim's car provides a sufficient basis for the voluntary manslaughter instruction. Defendant asserts that Rodriguez may have run into defendant, and "the jury readily could have found that the accident by itself, or coupled with [defendant's] anger over the injury to Arevalo, constituted sufficient provocation to reduce murder to voluntary manslaughter." We disagree.
Although there is some evidence that there was a collision, there is no evidence that Rodriguez was responsible for the collision or that defendant killed Rodriguez in a heat of passion due to the collision. (See People v. Holloway (2004) 33 Cal.4th 96, 140 [14 Cal.Rptr.3d 212, 91 P.3d 164] [no evidence of consensual sexual encounter on which claim of provocation was predicated]; cf. People v. Barton (1995) 12 Cal.4th 186, 191, 202 [47 Cal.Rptr.2d 569, 906 P.2d 531] [victim nearly collided with, and spat on, the defendant's daughter's car during traffic incident; an argument ensued between the defendant and the victim; voluntary manslaughter instruction was appropriate].)
For the first time in his reply brief in this court, and relying on dictum in a Court of Appeal case, defendant summarily asserts that the assistance Rodriguez was giving to Navarro (who defendant may have believed to be Arevalo's female attacker) supported a voluntary manslaughter instruction. (See People v. Spurlin (1984) 156 Cal.App.3d 119, 126 [202 Cal.Rptr. 663] [voluntary manslaughter instruction may be appropriate when "`deceased was present aiding and abetting the person causing the provocation'"].) We have rejected this view: "`The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' [Citation.]" (Avila, supra, 46 Cal.4th at p. 705.) Defendant cites no persuasive basis for us to revisit this settled principle.
We further reject defendant's contention that refusing the voluntary manslaughter instruction as to Rodriguez violated defendant's due process rights by requiring the jury to choose between capital murder and a complete acquittal. (See Beck v. Alabama (1980) 447 U.S. 625, 637 [65 L.Ed.2d 392, 100 S.Ct. 2382].) Beck was not violated because no evidence warranted a *295 voluntary manslaughter instruction. (See Hopper v. Evans (1982) 456 U.S. 605, 611 [72 L.Ed.2d 367, 102 S.Ct. 2049].) Moreover, the jury was instructed on the lesser included offense of second degree murder, which satisfied the due process requirement that an intermediate choice be given to the jury when supported by the evidence. (See Schad v. Arizona (1991) 501 U.S. 624, 646-648 [115 L.Ed.2d 555, 111 S.Ct. 2491].)

b. Failure to instruct on voluntary intoxication

Defendant contends the trial court erred in failing to instruct sua sponte on the effect of voluntary intoxication on his ability to form the mental state necessary for murder. Defendant claims that this error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7 and 15 through 17, of the California Constitution. We disagree.
(9) It is well settled that "[a]n instruction on the significance of voluntary intoxication is a `pinpoint' instruction that the trial court is not required to give unless requested by the defendant." (People v. Rundle (2008) 43 Cal.4th 76, 145 [74 Cal.Rptr.3d 454, 180 P.3d 224], citing People v. Saille (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Defendant cites no persuasive reason to revisit this conclusion.
Moreover, even if defendant had requested a voluntary intoxication instruction, the trial court would properly have refused it because "[a] defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's `actual formation of specific intent.'" (People v. Williams (1997) 16 Cal.4th 635, 677 [66 Cal.Rptr.2d 573, 941 P.2d 752], quoting People v. Horton (1995) 11 Cal.4th 1068, 1119 [47 Cal.Rptr.2d 516, 906 P.2d 478].) Indeed, such an instruction would have been inconsistent with the defense of mistaken identity and with defense counsel's statement during closing argument: "[W]hat makes you think he's going to shoot this guy and this girl when he's not drunk, when they haven't even done anything to him?"

c. Circumstantial evidence instructions

Defendant contends that the trial court's use of CALJIC No. 2.01 (which addresses the use of circumstantial evidence to support a finding of guilt) and CALJIC No. 8.83 (which addresses the use of circumstantial evidence to support a special circumstance finding) undermined the requirement of proof beyond a reasonable doubt, thus violating his federal and state constitutional rights to due process of law, to a jury trial, and to a reliable determination of guilt and penalty. He claims the instructions "operated as an impermissible *296 mandatory, conclusive presumption of guilt." We have repeatedly rejected these arguments, and defendant advances no persuasive reason to revisit our conclusion. (See, e.g., Zambrano, supra, 41 Cal.4th at p. 1159.)

B. Penalty Phase Issues

1. Victim impact evidence

Defendant contends the trial court failed to limit the prosecution's victim impact evidence, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7 and 15 through 17, of the California Constitution. We disagree.

a. Factual background

Richard Rodriguez's mother, two cousins, aunt, and uncle, and Yolanda Navarro's mother, sister, and brother described the effect of the murders on their lives. At the time of their deaths, both victims were 18 years old and recent high school graduates. Their funerals were well attended. At Yolanda's[9] burial, her brother Jonathan released two doves, which he testified represented Yolanda's and Richard's "spirits going to heaven." The high school that Yolanda and Richard attended built a memorial to them on campus that included two trees surrounded by flowers and a plaque bearing their names. In addition, a memorial service was held in that location.
Richard grew up without a father, but he was close to his uncle Robert and Robert's son. Richard was a straight "A" student in high school and played football. At the time of his death, Richard was attending California State University, Los Angeles, on a scholarship, and he wanted to become an engineer. Due to Richard's influence, his younger cousin Cynthia was successful in school and hoped to go to a major university. At Richard's funeral, Richard's three-year-old godson Nicholas pushed aside the roses from Richard's coffin so he could kiss it.
Yolanda was a responsible, nurturing, and popular person. She was interested in working as a nurse or with children. She had worked with children at a preschool and was scheduled to start work in a hospital on the Monday after her murder. Her brother Jonathan recalled: "[M]y mom had to clean out [Yolanda's] closet, and she had already bought her uniforms for work, and I . . . remember my mom sitting in Yolie's closet crying, holding onto the uniforms."
*297 Yolanda was a best friend to her older sister Ernestine (Tina), and the two sisters were inseparable. They were born on the same day five years apart, and celebrated their birthday together each year. Tina described the events that occurred on the morning of October 23, when the family searched for Yolanda and ultimately learned of her death. She told of the pain she experienced when breaking the news to her mother and making funeral arrangements. Tina also described visiting the crime scene with her father and seeing human remains in the grass.
Yolanda's brother, Jonathan, testified that he had been very close to Yolanda. Jonathan briefly described being outside on the morning of October 23, hearing shots, seeing the bodies of a "boy" and a "girl," and thinking, "Wow, they blew her brains out." He also described his feelings upon learning that the victim was his sister Yolanda: "[W]hy my sister[?] She never hurt anybody in her life." He added: "[S]omeone that I held in my heart and . . . held her hand as a baby, teaching her how to walk, to see her lying on the street like that." Jonathan at times wished he had arrived on the scene sooner and "maybe stopped something, or maybe they could have killed me instead."
Yolanda was very close to her father. On the day of the Halloween party, Yolanda finished recording an approximately 40-minute cassette tape with Mexican songs sung in Spanish. The tape was for her father, and she gave it to him before leaving for the party. Some of the songs were played for the jury. Yolanda's father died seven months after the murder.
Yolanda's mother, Armida, testified that all of the songs on the tape were about "losing someone, leaving someone, [and] having to say goodbye." When Yolanda left for the party, she told Armida, "I love you, Mom." Armida testified: "I never saw her again. I couldn't even see her at the funeral because she had to have a closed casket."
Yolanda was the godmother of Tina's daughter Christine, who was four years old at the time of Yolanda's death. Tina testified that after Yolanda's death, Christine made statements such as "I saw Auntie Yolie in my room last night." Tina also described incidents that she and Christine believed to be signs that "Yolie's spirit is still with us."
The jury also saw photographs depicting events and accomplishments in each victim's life, their funerals and memorial services, the observance of Yolanda's 19th birthday at the cemetery several months after her murder, and the condition of Yolanda's body at the time Jonathan saw her on the morning of October 23, 1994.

*298 b. Analysis

(10) "In a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. (Payne v. Tennessee (1991) 501 U.S. 808, 825-827 [115 L.Ed.2d 720, 111 S.Ct. 2597].) Under California law, victim impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (People v. Pollock (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353] (Pollock).) We conclude neither the federal nor the state standard was violated here.
The testimony was similar to other victim impact testimony that we have found admissible in the past. For example, in People v. Dykes (2009) 46 Cal.4th 731, 779-780, 782 [95 Cal.Rptr.3d 78, 209 P.3d 1] (Dykes), we upheld the admission of (1) testimony of a child victim's teacher, describing his popularity in school, (2) testimony of the victim's older sister regarding her feelings of sorrow and unreality while making funeral arrangements and her recollections of intimate interactions she had had with the victim, (3) testimony of the victim's grandmother describing her profound sense of loss and the effect the victim's death had on the victim's younger brother, and (4) a videotape of a family trip to Disneyland.
(11) As in other cases, the witnesses here described the "immediate effects" of the murders, as well as their "residual and lasting impact." (People v. Brown (2004) 33 Cal.4th 382, 397-398 [15 Cal.Rptr.3d 624, 93 P.3d 244].) Their recollections of past events involving Yolanda and Richard "simply served to explain why they continued to be affected by [the] loss and to show the `victim[s'] "uniqueness as . . . individual human being[s]."'" (Id. at p. 398, quoting Payne v. Tennessee, supra, 501 U.S. at p. 823.) Contrary to defendant's assertion, the circumstance that Yolanda's mother cried during her testimony does not render that testimony inflammatory. Her tears reflected a normal human response to the loss of a child, a response that the jury would reasonably expect a mother to experience.
In addition, the photographs of family events and other aspects of the victims' lives, including the family's postdeath observance of Yolanda's 19th birthday, were "relevant to humanize the victim[s] and provide some sense of the loss suffered by [their] famil[ies] and society." (Dykes, supra, 46 Cal.4th at p. 785.)
Testimony regarding the cassette tape of Mexican songs that Yolanda gave her father was also properly admitted. The tape was moving because it *299 demonstrated the close bond between Yolanda and her father, because it included songs about the loss of a loved one, and because Yolanda presented it to her father shortly before her death. It thus demonstrated the relationship lost as a result of Yolanda's murder, and the impact her death had on her father. These were circumstances of the crime appropriately considered by the jury. (Dykes, supra, 46 Cal.4th at pp. 780, 782 [testimony describing the child victim's intention on the day he was murdered to buy a toy for his younger brother with money he had saved from his allowance "plainly concerns the circumstances of the crime"].) Victim impact evidence is emotionally moving by its very nature, but that fact alone does not make it improper.
Nor, contrary to Justice Moreno's concurring opinion, did the trial court err in admitting the tape and in allowing a portion to be played for the jury. (See conc. opn., post, at p. 314.) Playing a "few" songs from the tape simply illustrated the gift Armida had described in her testimony. Had Yolanda instead created a collage of photographs of Mexico for her father, taken by individuals unrelated to the family, the trial court would have likewise acted properly in allowing the jury to view it. Simply because she gave her father music instead does not raise the same concerns that arise in the context of a filmed tribute to the victim, set to music. (See id. at p. 313.) In the latter case, the music may be irrelevant or serve only to evoke an emotional response (People v. Kelly (2007) 42 Cal.4th 763, 798-799 [68 Cal.Rptr.3d 531, 171 P.3d 548]); here, by contrast, the music was itself the relevant piece of evidence, being the thing that Yolanda chose to present to her father as a gift.
Defendant further contends the victim impact evidence was improper because it was not limited to the circumstances known to defendant at the time he committed the crime. As defendant acknowledges, however, this court has rejected this argument in past cases. (Dykes, supra, 46 Cal.4th at p. 783; People v. Lewis and Oliver (2006) 39 Cal.4th 970, 1057 [47 Cal.Rptr.3d 467, 140 P.3d 775]; Pollock, supra, 32 Cal.4th at p. 1183.)
Defendant also contends that admission of the victim impact testimony here under section 190.3, factor (a), violated the ex post facto clause of the federal Constitution because, as of the time of the crimes, no case law permitted such evidence as a "circumstance[] of the crime." Defendant is wrong. (See, e.g., People v. Edwards (1991) 54 Cal.3d 787, 833-836 [1 Cal.Rptr.2d 696, 819 P.2d 436].)
Finally, defendant contends that the prosecutor's closing argument at the penalty phase exacerbated the prejudicial nature of the victim impact evidence. We have concluded the victim impact evidence was properly admitted, and therefore the prosecutor was entitled to refer to this evidence in his argument.

*300 2. Scope of cross-examination

Defendant contends the trial court erred in permitting the prosecutor to cross-examine defense witness William Wright regarding a prior bad act of defendant, without having a good faith belief that the incident actually occurred. Defendant claims violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 15 and 17, of the California Constitution. We disagree.

a. Factual background

William Wright testified that he and defendant had been friends for about 23 years. He met defendant when defendant was between five and seven years old, and Wright was 17 or 18 years old. As a child, defendant was quiet, very respectful, and industrious. Wright had never seen him bully anyone or known him to be violent.
At sidebar during cross-examination of Wright, the prosecutor informed defense counsel and the court that he intended to ask Wright about an incident in which defendant put a gun to his younger sister Pauline's head and "threatened to blow her brains out." He stated that Donna Tucker had mentioned this incident in her taped interview, which occurred in May 1995. Defense counsel asserted that the tape of the interview was incomprehensible, and the court recessed to listen to the tape.
After the recess, and still outside the presence of the jury, the court inquired what the prosecutor intended to ask Wright about. The prosecutor said he would ask about defendant's desire "to kill one of Pauline's friends because the guy knew too much about him." He would also ask about defendant's alleged attack on Pauline, "throwing [her] up against the wall, cutting the phone lines, and when she ran out from the house, . . . chas[ing] after her and pull[ing] a gun on her." The court allowed the cross-examination, and Wright denied knowledge of the incidents.
Later, on direct examination of defendant's older sister Mary Alice Baldwin, defense counsel asked whether Pauline had ever told her that defendant "threw her against the wall or put a gun to her?" Baldwin replied, "No . . . [t]hey were very close." Defense counsel asked, "As far as you know, [defendant] never was hostile towards Pauline?" Baldwin answered, "No, no."

b. Analysis

(12) "When a defendant places his character at issue during the penalty phase, the prosecution is entitled to respond with character evidence of its *301 own. `The theory for permitting such rebuttal evidence and argument is not that it proves a statutory aggravating factor, but that it undermines defendant's claim that his good character weighs in favor of mercy.' [Citation.] Once the defendant's `general character [is] in issue, the prosecutor [is] entitled to rebut with evidence or argument suggesting a more balanced picture of his personality.' [Citation.] The prosecution need only have a good faith belief that the conduct or incidents about which it inquires actually took place." (Loker, supra, 44 Cal.4th at p. 709.)
Defendant contends that the prosecutor lacked the necessary "good faith belief" to support the questions he posed to Wright about defendant's attack on Pauline and the related threats. Relying on defense counsel's statement to the trial court that the tape of Donna Tucker's interview was unintelligible, defendant asserts that "[n]o evidence was ever introduced showing the incident occurred." We disagree. The trial court listened to the taped interview of Tucker and implicitly found that Tucker's statements provided the "good faith belief" necessary to support the prosecutor's questioning of Wright. We also have reviewed the tape and conclude, with one possible exception, that the trial court's implicit finding is supported by substantial evidence. The one exception is that we can discern no reference on the tape to a threat by defendant to "blow [Pauline's] brains out."
Even assuming, however, that the prosecutor should not have been permitted to ask Wright about a threat by defendant to "blow [Pauline's] brains out," no prejudice is evident under any standard. Tucker testified at the guilt phase that, for a year after her marriage to defendant's brother, defendant threatened to kill her and her husband, perhaps by a "shot in the back of the head." Moreover, the jury was instructed: "Do not assume to be true any insinuation suggested by a question asked [of] a witness. A question is not evidence and may be considered only as it helps you to understand the answer." The jury was further instructed that "[s]tatements made by the attorneys during the trial are not evidence." We presume the jury obeyed these instructions. (See, e.g., People v. Ledesma (2006) 39 Cal.4th 641, 684 [47 Cal.Rptr.3d 326, 140 P.3d 657] (Ledesma).)

3. Alleged Griffin error

(13) Defendant contends the prosecutor committed Griffin error when he said during closing argument: "He can't even face you, this defendant, who commits these two brutal, senseless murders." (See Griffin v. California (1965) 380 U.S. 609, 613, 615 [14 L.Ed.2d 106, 85 S.Ct. 1229] [it is a U.S. Const., 5th Amend. violation for the prosecution to comment on the defendant's failure to testify].) Defense counsel objected to the prosecutor's argument at the next recess.
*302 Assuming that the prosecution's statement constituted Griffin error, there was no possible prejudice under any standard. When argument resumed after the recess, the prosecutor told the jury: "When I talked about the defendant's testimony in the guilt phase, ... I was not commenting at all on his not testifying in the penalty phase." Moreover, the court instructed the jury at the close of the penalty phase: "The defendant elected not to testify in the penalty phase of this trial. It is the constitutional right of the defendant to elect to testify in the guilt phase only, or in the penalty phase only, or in both, or in neither. You're instructed not to consider or discuss the fact that the defendant elected not to testify in the penalty phase. That is a matter that must not in any way affect your verdict as to the penalty." We presume it heeded these instructions. (See, e.g., Ledesma, supra, 39 Cal.4th at p. 684.)

4. Timing of defense closing argument

Defendant contends the trial court erred under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7 and 15 through 17, of the California Constitution, when it postponed defense counsel's closing argument until the morning after the prosecutor's argument. We disagree.
Toward the end of the prosecutor's closing argument, the trial court inquired how much longer the prosecutor was going to be, and the prosecutor answered, "another 10 minutes." The court then asked defense counsel how long his argument would be. Counsel replied that he did not know, adding, "I thought 40, 50 minutes, but it looks like it may go longer." The court then asked the jury how it would feel about a 15-minute recess, followed by 10 more minutes of prosecution argument and 45 minutes of defense argument. Defense counsel interrupted, saying, "Maybe longer, your honor," and the court said to the jury: "I'm sorry. Maybe longer. Say an hour. Do you want to quit for the day after [the prosecutor], or do you want to go late?"
Juror No. 5 responded, "We'd like a break right now." The court suggested the jury take a break, discuss scheduling, and then let the court clerk know whether or not it wished to go late. The record does not indicate which, if any, preference the jury communicated to the clerk. After the recess, however, the court stated: "Bring out the jurors. We'll finish with your argument then and do the defense argument [at] 8:45 in the morning." The jury entered the room, the prosecutor finished his argument, the jury was excused, and the court made a brief statement to counsel before adjourning for the day.
The next morning, after the court conferred with counsel outside the presence of the jury, defense counsel gave his closing argument. At no time did defendant object to the scheduling of the closing argument.
*303 Defendant's claim of error was forfeited. (Farley, supra, 46 Cal.4th at p. 1130.) Defense counsel gave no indication to the court that he wanted to proceed immediately after the prosecution's argument finished. Rather, the court and counsel deferred to the jury's apparent preference to start the defense closing argument the next day. Defendant asserts that "[c]ounsel should have been given the opportunity to argue at least briefly" and stress "to the jury the importance of keeping an open mind" overnight, but nothing in the record indicates that counsel sought such an opportunity.
Even assuming the claim was not forfeited, scheduling the defense closing argument for the following morning falls within the court's "great latitude in controlling ... summations." (Herring v. New York (1975) 422 U.S. 853, 862 [45 L.Ed.2d 593, 95 S.Ct. 2550].)

5. Alleged instructional error

Defendant contends that the trial court erred under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7 and 15 through 17, of the California Constitution, when it failed to inform the jury that a verdict of life imprisonment without the possibility of parole "means exactly what that means."
The court instructed the jury: "It is the law of this state that the penalty for a defendant found guilty of murder in the first degree shall be death or confinement in the state prison for life without the possib[ility] of parole in any case in which the special circumstances alleged in this case [have] been specially found to be true." (Italics added.) The jury was also instructed: "It's now your duty to determine which of these two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed upon the defendant." (Italics added.) During deliberations, the jury sent the court a note asking, "In the event the defendant is given life in prison without the possibility of parole, is he still given a parole hearing and a chance of being released?" Over defendant's objection, the court responded, "You were instructed on the applicable law and should not consider or speculate about matters of law on which you were not instructed in arriving at a verdict of death or life in prison without the possibility of parole."
(14) The court's response was proper. "[W]e have consistently held that the phrase `life without possibility of parole' as it appears in CALJIC No. 8.84 adequately informs the jury that a defendant sentenced to life imprisonment without possibility of parole is ineligible for parole." (People v. Wallace (2008) 44 Cal.4th 1032, 1091 [81 Cal.Rptr.3d 651, 189 P.3d 911] (Wallace).) Nothing in Simmons v. South Carolina (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187] causes us to reconsider that conclusion. (See Wallace, at *304 p. 1091.) Moreover, as we have previously explained, any instruction that a sentence of life imprisonment without the possibility of parole "guaranteed defendant's incarceration until his death would be inaccurate, considering the Governor's commutation and pardon powers." (People v. Boyer, supra, 38 Cal.4th at p. 487.)
Defendant further contends that the trial court erred by failing to instruct the jury that defendant's age (22 at the time of the crimes) could only be considered in mitigation. We have repeatedly rejected similar contentions. (See e.g., People v. Hawthorne (1992) 4 Cal.4th 43, 77-79 [14 Cal.Rptr.2d 133, 841 P.2d 118]; People v. Lucky, supra, 45 Cal.3d at p. 302.) Nothing in Roper v. Simmons (2005) 543 U.S. 551, 555-556, 570-571 [161 L.Ed.2d 1, 125 S.Ct. 1183], which prohibits the imposition of the death penalty for crimes committed by persons under the age of 18, changes our conclusions in this regard. (Cf. Hawthorne, at pp. 77-78 [rejecting a similar argument based on Thompson v. Oklahoma (1988) 487 U.S. 815 [101 L.Ed.2d 702, 108 S.Ct. 2687] (plur. opn.), which prohibited the imposition of the death penalty for crimes committed by persons under the age of 16].)

6. Challenges to California's death penalty scheme

Defendant contends that sections 190.2 and 190.3 violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution in numerous respects. We have repeatedly rejected similar claims.
"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (Dykes, supra, 46 Cal.4th at p. 813.) In particular, the multiple-murder special circumstance adequately narrows the class of murderers subject to the death penalty. (People v. Box (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Likewise, "we reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death ...." (Dykes, at p. 813; see Tuilaepa v. California (1994) 512 U.S. 967, 975-976, 978-979 [129 L.Ed.2d 750, 114 S.Ct. 2630].)
The federal Constitution is not violated by section 190.3's failure (1) to designate factors as either mitigating or aggravating; (2) to require written findings or unanimity on the existence of aggravating factors; or (3) to require findings beyond a reasonable doubt that an aggravating circumstance (other than factor (b) and factor (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. (Dykes, supra, 46 Cal.4th at pp. 813-814; Avila, supra, 46 Cal.4th at p. 724.) Nothing in Cunningham v. California (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], Ring v. Arizona (2002) 536 U.S. 584 *305 [153 L.Ed.2d 556, 122 S.Ct. 2428], or Apprendi v. New Jersey (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] affects our conclusions in this regard. (People v. Valencia (2008) 43 Cal.4th 268, 311 [74 Cal.Rptr.3d 605, 180 P.3d 351] (Valencia); Avila, at p. 724.)
The trial court "need not instruct that the jury can consider certain statutory factors only in mitigation." (Valencia, supra, 43 Cal.4th at p. 311.)
Use of the adjective "extreme" in section 190.3, factor (d), and the adjective "impaired" in section 190.3, factor (h), is constitutional. (People v. Hawthorne (2009) 46 Cal.4th 67, 104 [92 Cal.Rptr.3d 330, 205 P.3d 245].)
"A prosecutor's discretion to select those eligible cases in which the death penalty is sought does not offend the federal or state Constitution." (Wallace, supra, 44 Cal.4th at p. 1098.)
The failure of California's death penalty law to require intercase proportionality does not violate the federal Constitution. (Pulley v. Harris (1984) 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 104 S.Ct. 871]; People v. Cox (2003) 30 Cal.4th 916, 970 [135 Cal.Rptr.2d 272, 70 P.3d 277].) "Nor does the circumstance that intercase proportionality review is conducted in noncapital cases cause the death penalty statute to violate defendant's right to equal protection and due process." (Farley, supra, 46 Cal.4th at p. 1134.) "[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law ...." (People v. Manriquez (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614].)

C. Posttrial Issues

1. Denial of new trial motion

Defendant contends the trial court erred under state law in denying his motion for new trial (§ 1181) and that the error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and article I, sections 7 and 15 through 17, of the California Constitution. We disagree.

a. Factual background

The jury returned its penalty verdict on July 14, 1997. Defendant advised the court he might be filing a motion for new trial, which after an extension of time was due on October 31, 1997. In case defendant filed a new trial motion, a hearing was set for November 14, 1997. Defendant did not file a *306 new trial motion. Instead, on November 13, 1997, he filed a motion to continue the hearing date. In a supporting declaration, defense counsel stated that, on or about October 10, 1997, he had learned of letters Donna Tucker had written to defendant's sister Pauline Verdugo that possibly impeached Tucker's credibility. Defendant ultimately filed a new trial motion on August 13, 1998, and on March 12, 1999, he filed a "summary of grounds" for the motion. He filed a second "summary of grounds" on June 3, 1999.
The letters Tucker had written to Pauline Verdugo formed the basis for several of defendant's arguments. Among other things, defendant contended that Tucker was biased in her testimony against him because the letters revealed that she was planning to or was having a romantic relationship with Detective Markel,[10] and also because she had been promised reward money. The court held an extensive evidentiary hearing.
At the hearing, Tucker confirmed that the letters were written in her handwriting. She testified that, although she admired Detective Markel and would have liked a romantic relationship with him, "there was never anything going on between [them]." She said she lied in her letters to Pauline about Markel watching her because she wanted the Verdugo family to think she had police protection. Tucker also said that she did not lie in court to attract Markel. Markel testified that his relationship with Tucker had been merely professional. He said that he became aware that Tucker was interested in him romantically only after he learned of her letters to Pauline. Kevin McCormick, the former prosecutor on defendant's case, testified that he had never witnessed *307 any inappropriate behavior between Tucker and Detective Markel, and Tucker had never told him that she was infatuated with Markel. Detective Teague testified that he knew of no occasion on which Markel and Tucker met alone.
Tucker further testified that she had falsely told Pauline that she was promised reward money, hoping to convince Pauline that Tucker would take care of her. Tucker considered Pauline to be like a daughter. She thought she was entitled to the reward money, but it was not her decision who received it. Although she wanted to take care of Pauline, she also observed that "it would turn [her] stomach [to receive the reward money] because someone I loved murdered those two kids, and to profit from someone else's tragedy, I couldn't do." She testified that she had not received any reward in this case.
Detectives Ewing Kwock and Jerry Stephens testified that no claims had been made on the reward money. Markel testified that he recalled at some point telling Tucker that there was a reward, but he never promised her the reward money. He described this conversation as being brief: "[Tucker] told me that she was not the least bit interested in it and that was the end of the talk of the reward." Markel testified that he would not entice a witness with reward money. Likewise, Detective Teague testified that he had never promised any reward money to anyone in this case. Trial Prosecutor Michael Duarte testified that the only discussions he had regarding whether Tucker was promised reward money occurred after trial, when the defense raised the issue.
In addition, Pauline Verdugo testified regarding the circumstances under which she had disclosed the letters, and Detectives Kwock and Stephens testified regarding investigative interviews they conducted with Tucker and Markel after the revelation of the letters. Tucker told Kwock that she had a "crush" on Detective Markel, but that it was only wishful thinking. Defendant's sister Mary Alice Baldwin testified regarding Pauline's contact with other members of the Verdugo family before and during the trial, and about her own contact with Defense Counsel George Hernandez. Baldwin also testified that Tucker told her before trial that she was "falling for Detective Markel." Baldwin told Defense Counsel Hernandez before trial that Tucker had said that Markel had offered her the reward and that she intended to accept it.
The trial court denied the new trial motion. The court found credible Tucker's and the "officer's"[11] testimony at the hearing on the motion. Given *308 what the trial evidence had revealed about the Verdugo family, the court said that Tucker's explanations made "a lot of sense." With respect to the reward money, the court credited Tucker's hearing testimony that she was not promised any reward, and the court noted that other testimony corroborated Tucker's testimony. The court also credited Tucker's explanation of her contradictory assertion to Pauline that she had been promised the reward. Finally, the court stated that, "even taking Donna [Tucker] out of the case," the verdicts in both phases of the trial would have been the same.

b. Analysis

(15) "To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial." (People v. Ochoa (1998) 19 Cal.4th 353, 473 [79 Cal.Rptr.2d 408, 966 P.2d 442].) "[T]he trial court has broad discretion in ruling on a new trial motion ....," and its "ruling will be disturbed only for clear abuse of that discretion." (People v. Ault (2004) 33 Cal.4th 1250, 1260 [17 Cal.Rptr.3d 302, 95 P.3d 523].) In addition, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (People v. Nesler (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87] (lead opn. of George, C. J.).)
Several of the grounds defendant raises on appeal in challenging the trial court's denial of his new trial motion have already been discussed in detail in this opinion and rejected. Specifically, he asserts that he was entitled to a new trial because (1) the prosecution had failed to disclose Tucker's receipt of witness relocation funds, a fact that the defense could have used to impeach her; (2) the trial court had excluded evidence related to Tucker's mental health problems; and (3) the trial court had precluded defendant from using the investigation of wrongdoing by Detectives Teague and Markel to substantiate his explanation for why he had arranged for the purchase of eyeglasses that could be used as false evidence. For the reasons already stated (see, ante, pts. II.A.2.e., II.A.3.a., II.A.3.b.), we find these arguments unpersuasive. (People v. Burgener (2003) 29 Cal.4th 833, 893 [129 Cal.Rptr.2d 747, 62 P.3d 1].)
The trial court also did not err in concluding that the letters Donna Tucker wrote to Pauline Verdugo did not provide a basis for granting a new trial. Although certain statements in Tucker's letters are troubling, the court found her explanations of those statements to be credible, and substantial evidence in the form of her testimony and that of other witnesses supports this credibility determination.
*309 To the extent defendant claims that the letters represented newly discovered evidence that Tucker had been in a psychiatric institution[12] and that the new trial motion should have been granted on that ground, he forfeited the claim by failing to assert it below, either in his motion for a new trial or in his two statements of grounds for the motion. In addition, the letters were not newly discovered evidence of Tucker's hospitalization, because defendant was aware during trial of the possibility that Tucker had been hospitalized in a psychiatric institution, and could have investigated the matter at that time. (§ 1181.) Finally, defendant does not identify what Tucker's psychiatric problems were or how they would have affected her credibility.
"Defendant has shown no manifest and unmistakable abuse of discretion in the trial court's ruling [on the new trial motion]. No basis for reversal appears." (Zambrano, supra, 41 Cal.4th at p. 1188.)

2. Denial of request to discharge retained counsel

Defendant contends the trial court erred under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and analogous provisions of the California Constitution when, in the middle of the evidentiary hearing on the new trial motion, the court denied defendant's request to discharge retained counsel. We disagree.

a. Factual background

As noted above, the penalty verdict was rendered on July 14, 1997, and on August 13, 1998, more than a year later, defendant filed a new trial motion. On September 11, 1998, five witnesses, including Donna Tucker, testified at the hearing on the new trial motion. The hearing was continued to September 25, 1998, at which time Defense Counsel George Hernandez did not appear, apparently because of a miscommunication regarding the time of the hearing. The hearing was then continued to October 23, 1998. Hernandez again failed to appear, this time because he was ill, and the hearing was continued to November 20, 1998.
At the outset of proceedings on November 20, 1998, Hernandez stated that defendant "would like to relieve me as counsel." The court denied the motion as untimely, observing that they were in the middle of a hearing in which considerable evidence had already been introduced, the trial involved a lengthy transcript, and replacing counsel would cause substantial delay.
*310 Defendant attempted to bolster his request to discharge counsel by stating that Hernandez did not visit or telephone him with sufficient frequency. Hernandez also stated that he had a conflict of interest because of a "veiled threat" that defendant's father, Salvador Verdugo, had made against him at the time of the September 11, 1998 hearing. Salvador Verdugo allegedly told Hernandez: "[I]f anything happens to my son ... we'll see what happens to you," or words to that effect. Hernandez did not report the incident to the police, but he had no further contact with Salvador until three or four days before the November 20 hearing, when he spoke to Salvador on the telephone. In that conversation, Salvador said he was angry and "don't forget."
The trial court commented that the alleged threat against Hernandez did not appear "serious and credible" and that Hernandez's representations sounded like "another ... last ditch effort to somehow derail these proceedings." Out of concern, however, that the circumstances might warrant counsel's removal, the court continued the hearing so that Salvador Verdugo could be questioned, and it also requested briefing on the applicable legal standards.
On December 4, 1998, Salvador Verdugo testified that after a recent court session,[13] he followed Hernandez into the parking lot to ask about the case, feeling dissatisfied by Hernandez's lack of communication with him. When his attempt to obtain more information was unsuccessful, Salvador told Hernandez: "[I]f my son goes down, ... because ... you're not doing your job, ... you're going to go down, too. I'm going to go before the board and see that you go down." By "board," Salvador meant the State Bar. Salvador, who was on probation and who considered Hernandez to be a friend, said that he never threatened Hernandez with physical violence.
The court denied the motion to relieve counsel. The court determined that no threat had actually been made and that Hernandez had simply misunderstood the situation. As to the other grounds raised in support of the motion, the court relied on the circumstances that there had been a lengthy trial, the new trial motion had been continued numerous times, and "to relieve Mr. Hernandez ... at this time would ... severely disrupt the orderly processes of justice." The court observed that the events pertinent to the new trial motion were "still somewhat fresh in the witness[es]' memory" and that examination of Donna Tucker had already begun.

b. Analysis

(16) The right to retained counsel of choice issubject to certain limitations guaranteed under the Sixth Amendment to the federal Constitution. *311 (United States v. Gonzalez-Lopez (2006) 548 U.S. 140, 144, 151-152 [165 L.Ed.2d 409, 126 S.Ct. 2557]; People v. Ramirez (2006) 39 Cal.4th 398, 422 [46 Cal.Rptr.3d 677, 139 P.3d 64].) In California, this right "reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain." (People v. Ortiz (1990) 51 Cal.3d 975, 983 [275 Cal.Rptr. 191, 800 P.2d 547] (Ortiz); see Code Civ. Proc., § 284.) The right to discharge a retained attorney is, however, not absolute. (Ortiz, at p. 983.) The trial court has discretion to "deny such a motion if discharge will result in `significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in `disruption of the orderly processes of justice' [citations]." (Ibid.; see United States v. Gonzalez-Lopez, at p. 152 [a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness" and "against the demands of its calendar"].)
Defendant contends that the denial of his motion "forced him to proceed with an attorney he did not want and with whom he had a conflict of interest." Defendant, however, does not identify any specific conflict of interest between him and Hernandez, and he denies that the asserted threat against Hernandez was the basis of his motion to relieve counsel. In the absence of any identified conflict of interest, defendant's argument fails.
Defendant further asserts that the trial court erred because there was no evidence that relieving counsel would have resulted in unreasonable disruption. He points out that the request to relieve counsel was made on November 20, 1998, the new trial motion was not ruled on until June 18, 1999, and sentencing did not occur until November 19, 1999, and therefore new counsel would have had enough time to become familiar with the case.
We conclude the trial court acted well within its discretion in denying defendant's motion to relieve counsel. At the time the motion was made, the parties were embroiled in a hearing on the new trial motion that focused on the credibility of a major prosecution trial witness. Numerous witnesses had already testified, and well over a year had passed since the penalty verdict. New counsel would have had to become familiar with the specific matters at issue in the new trial motion, but to understand the significance of those matters, new counsel would also have had to study the entire lengthy trial record, resulting in significant delays. Meanwhile, the witnesses' memories of events pertinent to the new trial motion would naturally have faded over time, an event that the trial court stated would undermine its ability to judge the witnesses' credibility. The trial court reasonably found these circumstances to constitute "`disruption of the orderly processes of justice,'" justifying denial of the motion to relieve counsel. (Ortiz, supra, 51 Cal.3d at p. 983.)

*312 3. Cumulative prejudice

Defendant contends that the cumulative effect of guilt and penalty phase errors requires us to reverse the judgment. Where we have found or assumed error, we have concluded that there was no prejudice under any standard. We also find no cumulative prejudice.

4. Alleged violation of international law

Defendant contends that the violations of state and federal law in his case also violate international law. We disagree. We have found no violations of state or federal law that preclude imposition of death in this case. "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (People v. Hillhouse (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

III. DISPOSITION
We affirm the judgment.
George, C. J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.
MORENO, J., Concurring.
I concur in the judgment, but disagree with the majority in their analysis of the admission of an audio cassette, consisting of several Mexican songs, that was played to the jury and that was admitted under the aegis of "victim impact evidence." In my view, this cassette should not have been admitted.
"In a capital trial, Eighth Amendment principles ordinarily do not prevent the sentencing authority from considering evidence of `the specific harm caused by the crime in question.' (Payne v. Tennessee (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].) The high court has explained that the prosecution has a legitimate interest in rebutting the mitigating evidence that the defendant is entitled to introduce by introducing aggravating evidence of the harm caused by the crime, `"reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."' (Ibid.) `[W]e also have found such evidence (and related "victim character" evidence) admissible as a "circumstance of the crime" under section 190.3, factor (a).' [Citation.] We have cautioned, however, `that allowing such evidence under factor (a) "does not mean that there are no limits on emotional evidence and argument."' [Citation.] `"`The jury must face its obligation soberly and rationally, and should not be given the *313 impression that emotion may reign over reason.'"' [Citation.]" (People v. Prince (2007) 40 Cal.4th 1179, 1286-1287 [57 Cal.Rptr.3d 543, 156 P.3d 1015], fn. omitted.)
The use of music, an inherently emotional form of expression, in victim impact evidence, has been a concern to a number of courts. In U.S. v. Sampson (D.Mass. 2004) 335 F.Supp.2d 166, 191-193, the court excluded a 27-minute videotape containing 200 still photographs of the victim, in part because of the "evocative accompanying music" by the Beatles, James Taylor and others. In Salazar v. State (Tex.Crim.App. 2002) 90 S.W.3d 330, the Texas criminal court held inadmissible a similar videotape in part because of the accompanying music by Enya and Celine Dion singing "My Heart Will Go On." And this court has cautioned against the use of "stirring music" accompanying a filmed tribute to the victim. (Prince, supra, 40 Cal.4th at p. 1289; see also (See also Kelly v. California (2008) 555 U.S.___, ___ [172 L.Ed.2d 445, 129 S.Ct. 564, 567] (separate statement of Stevens, J., on denial of cert.) [noting the inherent risk of prejudice of victim impact evidence "enhanced with music"]; Kelly, at p. ___ [129 S.Ct. at p. 568] (statement of Breyer, J., dissenting from cert. denial); Kelly, at p. ___ [129 S.Ct. at p. 564] (noting Justice Souter's vote to grant cert.).) Music rarely if ever has informational content that can contribute to a capital jury's sober and rational decisionmaking. Its purpose and effect, generally, is to evoke an emotional response from the jury. Such emotional evocation, while suitable for a memorial tribute to the victim, is wholly inappropriate at the penalty phase of a capital trial, where the purpose is not to honor the victim but to decide whether the defendant should receive a death sentence. (See People v. Kelly (2007) 42 Cal.4th 763, 805 [68 Cal.Rptr.3d 531, 171 P.3d 548] (conc. & dis. opn. of Moreno, J.).)
In the present case, Yolanda Navarro's mother Armida testified at length about the close relationship Yolanda had with her father. She further testified that Yolanda had made her father a cassette tape of Mexican songs on the theme of loss and parting. The majority does not explain what additional information was conveyed to the jury by playing the songs. That Yolanda's father, who was no longer alive, was close to Yolanda and undoubtedly felt heart-wrenching loss at her death was well established by Armida's testimony. Assuming arguendo that the fact that Yolanda made a tape for her father was relevant for showing her closeness to her father and therefore the great impact that her death had on him, the majority does not explain how listening to her actual selection of songs assisted the jury one iota. The contents of the cassette had nothing to do with defendant's character, culpability, or the circumstances of the offense, which are supposed to be the jury's sole concern during the penalty phase. (See People v. Martinez (2010) 47 Cal.4th 911, 963 [105 Cal.Rptr.3d 131, 224 P.3d 877].) The fact that she selected sad songs rather than happy ones, Spanish songs rather than English *314 ones, one genre rather than another, did not make defendant more or less deserving of the death penalty. On the other hand, these songs of loss, even if the jury did not understand Spanish lyrics, had the distinct potential of being used to manipulate the jurors' emotions.[1]
I nonetheless conclude on the present record that the trial court's error in admitting the tape was not prejudicial. It can be reasonably inferred that only a "few" of the songs were played (maj. opn., ante, at p. 299), the portion played was a relatively small part of the prosecutor's penalty phase case, and, precisely because its connection to victim impact or character evidence was so tenuous, the music here was less likely to bias the jury than music accompanying victim impact evidence found to be prejudicially admitted. (See, e.g., Salazar v. State, supra, 90 S.W.3d at p. 335.)
NOTES
[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] There is no indication in the record that Jonathan Rodriguez and murder victim Richard Rodriguez were related.
[3] The prosecutor asked defendant if he had waited for Arevalo about 10 minutes, and defendant answered: "No. It was short." On redirect examination by defense counsel four days later, defendant stated he waited an hour to an hour and a half. In response to the prosecutor's later inquiry about this discrepancy, defendant said that he had "hurried" to answer the prosecutor's questions and "left a lot of things out."
[4] In his opening statement, defense counsel promised to show the jury the eyeglasses defendant wore at the party, thereby undermining the prosecution's argument that the eyeglasses found at the scene of the murders were defendant's eyeglasses. Later, the prosecution introduced evidence indicating that, long after the murders, defendant's brother and father purchased eyeglasses that resembled the eyeglasses police had found at the murder scene.
[5] What we said in People v. Loker (2008) 44 Cal.4th 691, 704, footnote 7 [80 Cal.Rptr.3d 630, 188 P.3d 580] (Loker), is equally applicable here: "[A]s to this, and almost every other appellate claim, defendant contends the alleged error infringed his constitutional rights. In those instances where he did not present constitutional theories below, it appears that either (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution. `To that extent, defendant's new constitutional arguments are not forfeited on appeal.' (People v. Boyer (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].) No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or `gloss' raised for the first time here."
[6] The deputy district attorney who tried the case, Michael Duarte, was personally unaware of the relocation assistance until after the trial.
[7] McCormick's declaration in support of the ex parte motion stated: "This amount will cover first and last months['] rent ($1,098) plus security deposit ($0.00), activation of phone ($46.00), activation of water and power ($0.00) and activation of gas ($25.00). This amount additionally would cover the reasonable cost of relocating to a new residence ($149.00)."
[8] At the posttrial hearing on defendant's motion for a new trial, the trial court prohibited the defense from questioning Tucker about her psychiatric problems, because defendant had not raised the issue in his motion.
[9] Because the victims and many of the witnesses at the penalty phase have the same surname, we will refer to the victims and witnesses by their first names in this portion of the opinion.
[10] In her letters, Tucker made such statements as:

(1) "But my dreams are about this sweet cop. I'll be seeing him soon, but only to prepare for trial. I know he still likes me a lot too, but gotta wait til after the trial to ask me out. But he watches me from a distance sometimes. That's when I get out my best short skirt or nice dress. Then he lets out a whistle that I can recognize! Ha! Hooked him! I can't wait to start going out with him. He's so damned adorable and sweet.... [¶] I can't go swimming for 2-1/2 weeks or so. But I'll find a real good bikini to really reel in Chuck then! Ha!"
(2) "I'm still nuts about C., but he can't come up to meif he's even still interested until after the trial. He's the male version of me. I really believe he'd be perfect for me. We'll see."
(3) "So guess who was across the way looking at me from another balcony[?] Chuck! Hey! Still likes me! Guess I made the right choice. Besides I'm still nuts about that cutie. Although, I WANT my full privacy back. But when I've talked to him about it before, he acts like it's not happening. And he worries so damn much. If I'm upset or sick or angry, he checks on me from a distance. Boy! What a strange way to have to live, waiting until this trial is done. It's kinda w[ei]rd, kinda annoying, kinda nice and sometimes i[t']s kinda like a hug. So strange! Why the hell did I fall for someone during all this mess, when I had decided no on[e] is gonna get close to me?"
(4) "My favorite detective is back on this case. He's such a sweetie. You wouldn't believe how I was protected! By two police dep[uties] and sheriff[]s and by [a Los Angeles Police Department] helicopter. Boy! And he says `What? Do you feel like you're being followed?'... He really likes me so much and I'm nuts about me [sic]. But neither of us can do or say anything until this case is over. So nothing's happening."
[11] This reference was presumably to Detective Markel. The court may also have meant "officers'" (possessive plural). Although the court reporter chose the word "officer's" (possessive singular) when preparing the written transcript, no reason appears to assume that, when speaking the word, the court meant the reference to be singular rather than plural.
[12] In a letter to Pauline, Tucker stated: "I had my med[ical] exams last Sat[urday]. All because of my stay in the cookie factory at A.V. Hospital. Also, I will have a hearing in a couple months from Victim/Witness Assistance to cover my med[ical] expenses at the hospital, counseling, and lots of chiropractic visits (since last Spring)."
[13] Salvador testified that the encounter took place after a hearing in October 1998, but he must have been referring to the September 11, 1998 hearing, because Mr. Hernandez did not appear at the October 23, 1998 hearing.
[1] The majority states: "Had Yolanda instead created a collage of photographs of Mexico for her father, taken by individuals unrelated to the family, the trial court would have likewise acted properly in allowing the jury to view it." (Maj. opn., ante, at p. 299.) Although this dictum is broadly stated, I do not understand it to excuse trial courts from carefully weighing the probative value and potential prejudicial impact of admitting artistic works by victims at the penalty phase.