Filed 7/30/14  P. v. Gonzalez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

FRED JAVIER GONZALEZ,

    Defendant and Appellant.

E057526

(Super.Ct.No. RIF1100847)

OPINION

APPEAL from the Superior Court of Riverside County.  Michael B. Donner, Judge.  Affirmed in part; reversed in part with directions

John E. Edwards, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant, Fred Gonzales, of four counts of making criminal threats (Pen. Code, § 422)[1] and five counts of the misdemeanor of making annoying/harassing phone calls (§ 653m, subd. (b)). He was sentenced on the felonies to four years in prison and on each of the misdemeanors to a concurrent six month term. He appeals, claiming all of his convictions should be reversed for various reasons, all of which we reject. However, we reverse two of his misdemeanor convictions for jury instruction error and direct the trial court to omit reference to them in the minutes of the sentencing hearing should the People opt not to retry him for them. Otherwise, we affirm.

**FACTS**

The victim worked for defendant in his insurance agency between February and July, 2009 and interacted with him daily during that period. As his business began to go bad in June 2009, defendant became erratic and moody and the victim eventually quit. After the victim left his employ, defendant began calling her on her cell phone. These calls, and those that followed, will be described later in this opinion. In April 2010, the victim began working at an insurance agency unconnected to defendant, which will hereafter be referred to as the Moreno Valley insurance office. The victim's female coworker was defendant's office manager at his insurance agency and worked daily with defendant between February 2009 and June 2009, when defendant let her go because he

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

did not have enough money to pay her.  In September 2009, defendant began calling the victim's female coworker, which will be described later in this opinion.  Also in April 2010, the victim's female coworker began working at the Moreno Valley insurance office.

1.  *Convictions for Making Annoying/Harassing Calls*

The First Amended Information charged defendant with five counts of making annoying calls "on or about July 2010 through and including December 2010 . . . ."

The victim's female coworker testified that defendant called her for the first time on September 5, 2009, during which he referred to her as a fucking bitch.  He called again on December 24, 2009 and said, "Fuck you."  She hung up, he called right back and said, "Nigga."  On January 1, 2010, he contacted her, wishing her a Happy New Year, then followed it up with, "I didn't mean you, bitch."  In February 2010, she received 12 texts or phone calls from defendant.  Some came at 3:00 or 5:00 a.m., some were to her home phone, there was an immediate hang up, then an immediate follow up call to her cell phone, and so on for minutes.  In February, she reported the calls to the police and changed both her cell and home phone numbers.  She did not hear from defendant again until she began working at the Moreno Valley insurance office in April 2010.  Between then and July 11, 2010, there were about 25 to 50 or over 50 calls from defendant to that office.  On July 12, 2010, she and her fellow employees began keeping a log of all the suspicious calls that came into the office.  In July 2010, defendant called the office about 90 times, five of which she received herself; in August 2010, 113 times,

3

12 of which she received herself, and during one of which defendant left a voice mail that included the word, "bitch." On August 24, 2010, defendant called and referred to people as "bitch" and "ho." The female coworker replied, "[Defendant's first name], come on. Please[,]" and she hung up. Defendant called with the same frequency in September 2010 as he had in August, some of which calls the female coworker received herself. During one such call, defendant, attempting to disguise his voice, asked where the office was located and when the female coworker told him where it was, he replied, "Oh, out there. Where are all the Niggers living out there? I'm not coming there." She retorted, "[Defendant's first name], seriously" and hung up. Defendant's call frequency began to slow in October and November. The victim or the victim's male coworker answered the majority of the calls, and only the three of them worked in the office.

The victim testified that after working daily for defendant in his insurance agency for five months, she quit in July 2009 because defendant got angry at her. Thereafter, defendant called her on her cell phone. In the beginning, he called about once a month and left a voice mail message saying that the victim was a whore and fat and a "cunt." When the calls increased in the Fall of 2009, she changed her cell phone number. Unfortunately, this new number was placed on paperwork for her application for benefits from the Employment Development Department, of which defendant, as her former employer, received a copy, and she began receiving calls at the new number about once a week, during which things were said that defendant had said before. She changed her cell phone number again in early 2010 and did not hear from defendant until she, too,

4

began working at the Moreno Valley insurance office in May 2010 and defendant called many times a day, referring to her as a "fat bitch." She recorded some of the calls defendant made and some of these recordings were played for the jury. During those calls, which the victim answered, the caller used, inter alia, the words, "fucking," "whore," "bitch," "pig," and "blow job." She, her female coworker, her male coworker and the manager/owner of the agency kept track of these calls in a log, the latter marking down two calls.

A male coworker testified that he began working at the Moreno Valley insurance office in April 2010 and he did not know defendant. Many repeat calls were made to the office during which the caller would hang up or ask pretense questions. During one, the caller said he would not come to the office because it was in the ghetto and he used "an explicit term." Daily, sometimes more than three to four times an hour, the caller would rant about the victim and call her names. The male coworker recognized the voice of the caller as being the same voice he had heard over and over. After a couple of weeks of the victim receiving calls and reacting very badly to them, the male coworker began answering most of the calls to prevent the victim from having to hear them.

A detective testified that according to the records for defendant's cell phone, defendant called the Moreno Valley insurance office more than 400 times between July and December, 2010—often repeat calls in quick succession. There were more calls in July and August, at more than 100 each month, and less in December. The majority of the time, defendant dialed star 67, before dialing the office's phone number, which

renders whoever answered the phone at the office unable to identify the caller's number. Defendant's phone records, which were shown to the jury, verified all of this.

The jury was instructed that defendant was guilty of making annoying phone calls if he "made repeated phone calls" to the victim, her female coworker, her male coworker and the Moreno Valley insurance office. During argument to the jury, the prosecutor said of these crimes, "When you're in the [jury deliberation room], . . . I encourage you to look at . . . the defendant's phone records. . . . This is what's going to help you when you look at [these c]ounts . . . . And there's . . . only five counts for annoying phone calls, even though he made hundreds. [¶] I encourage you to look at the counts this way: Counts 5, 6 and 7, I would apply to the three months that he called . . . [the Moreno Valley insurance office] over a hundred times—July, August and September. . . . [¶] And then Counts 8 and 9, I encourage you to apply to the two people, specifically that those annoying calls are directed to [the victim's female coworker] and [the victim]. The defendant's not charged with all of the annoying calls that went on for a year before and all the time [the victim's female coworker and the victim] had to change their phone numbers. And . . . you heard that [the victim's female coworker] would receive calls at home on her home phone, cell phone at 3:00 a.m. . . . He's not even charged with that. [¶] He's only charged with when the police stepped in, and he continued to call between July and September, December 2010. . . . *You know that all those calls were directed to* [*the victim*] *and* [t*he victim's female coworker*] *at their place of work at* [*the Moreno Valley insurance office*]. [¶] . . . I started to highlight every call from the defendant's cell

6

phone to [the Moreno Valley insurance office]. And I had to stop at about page 68 because my highlighter was running out of ink. Look through th[e phone records]. You'll see this is just one day alone. Multiple calls one right after another. Over and over and over.[2] And I tabbed some of the pages for you to save you time, just to show you how many calls." "The time frame [for all the calls about which the victim and her female coworker testified] is from before any of these charges we're talking about—[in] 8/9/09, in February of 2010, all the way to June 2010. . . . The reason you heard [about these calls] is because it laid a foundation . . . for how the victim . . . [and her female coworker] knew [defendant's] voice—how they had received these calls, knew his voice, sometimes disguised, sometimes not, for months and months."

Defendant begins his attack on his conviction for these offenses[3] by asserting, "[t]he prosecutor did not explain why she chose to diverge from the complaint, in which all five . . . counts plead the identical timing for the calls." Defendant cites no authority holding that the prosecutor cannot make an election and relate different counts that have been plead with the same time frame, to different acts. Defendant then asserts, "[t]he prosecutor did not specify which counts she would 'encourage' the jury apply to which months." The record belies this assertion. She clearly related counts 5, 6 and 7 to the

---

   **2** While we have no way of knowing to what pages of defendant's phone records the prosecutor was referring, if it was pages 25-27 or pages 33-34 or pages 38-40 or pages 42-45 or pages 49-51 or 52-54 or pages 67-68, the prosecutor was entirely correct.

   **3** We bypass the issues of waiver and incompetency of defense counsel at trial by addressing defendant's contentions on their merits.

months of July, August and September, 2010, respectively. Defendant continues, "[The prosecutor] never specified that the jury could only convict [defendant] if it found that [defendant] made those calls in those months, or that its finding on those counts must be based only upon calls to [the Moreno Valley insurance office]." We disagree with both assertions. The prosecutor clearly made an election that count 5 was to be based on calls that were made during July 2010, count 6 was to be based on calls made during August 2010 and count 7 on calls made during September 2010. Therefore, contrary to defendant's contention, there was no need to give a unanimity instruction as to those counts. (*People v. Jennings* (2010) 50 Cal.4th 616, 679, 680.) As to where the calls were directed, the only evidence adduced as to the calls during this period were calls to the Moreno Valley insurance office. Both the victim and her female coworker testified that defendant stopped calling their home and cell phones when they changed the numbers to them before beginning work at the Moreno Valley insurance office in the Spring of 2010. Moreover, the prosecutor pointed to the calls defendant made from his cell phone to the Moreno Valley insurance office during her argument concerning these counts and to no other calls.[4] The only problem we detect is with counts 8 and 9, which the prosecutor

---

[4] Defendant admits as much when he states in his opening brief, "In her closing argument, the prosecutor argued that counts five, six and seven all could be applied based upon the calls place to [the Moreno Valley insurance office]." Defendant can't have it both ways. Additionally, in arguing that there was insufficient proof of these crimes, defense counsel said to the jury, "The . . . [prosecutor is] saying that you should convict [defendant] for harassing phone calls to [the Moreno Valley insurance office]." For the same reasons, we reject defendant's related assertion that "There is . . . no way to

*[footnote continued on next page]*

8

elected to apply to calls during the July-December 2010 period that were received by the victim and the victim's female co-worker. The jury was not told that it could not use the same calls it used to convict defendant of counts 5, 6 and 7 to also convict defendant of these counts. In fact, the prosecutor's argument was that all the calls which resulted in counts 5 through 9 were "directed at" the victim and her female coworker.[5] As such, the jury should have been instructed that it could not use the same calls to convict defendant of counts 8 and 9 that it used to convict him of counts 6, 7 and 8. Because of this, we will reverse the convictions for count 8 and 9. Given that, we cannot agree with defendant's assertion that "it [is] impossible for this court to determine the basis for the jury's finding on" counts 6, 7 and 8. It is abundantly clear to us what the bases were. Therefore, we disagree with defendant that his rights to due process and to a jury trial were violated by the way this case was presented to the jury.

Next, defendant asserts that his convictions for counts 5, 6 and 7 must be reversed because the victim of those counts is the Moreno Valley insurance office and only a natural person can be the victim of a violation of section 653m, subdivision (b). Section 653m, subdivision (b) provides, "Every person who, with intent to annoy or harass, makes repeated telephone calls or makes repeated contact by means of an electronic

---

*[footnote continued from previous page]*
know . . . whether the jury considered phone calls outside of the July through December timeframe charged in the complaint."

[5] See the italicized portion of the prosecutor's argument on page seven.

9

communication device, or makes any combination of calls, or contact, to another person is, whether or not conversation ensues from making the telephone call or contact by means of an electronic communication device, guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith or during the ordinary course and scope of business." However, it is a matter we need not resolve. The only evidence adduced at trial was that defendant made calls that were answered by an employee of the Moreno Valley insurance office. No one testified that employees of the office did not answer these calls—in fact, the male coworker suggested that all calls were answered by one of the people working at the office out of an abundance of caution that it might be a legitimate call. Additionally, the records of defendant's cell phone showed that many of the calls to the Moreno Valley insurance office were answered. When defendant dialed the Moreno Valley insurance office's number, he was calling a human being, whom he expected to answer the phone. Although the instruction allowed the jury to consider calls made to the Moreno Valley insurance office, as differentiated from calls made to the victim, or her female coworker or her male coworker, there is no reasonable likelihood that the jury convicted defendant of the three counts based on calls for which those three persons did not pick up the phone. (*People v. Breverman* (1998) 19 Cal.4th 142, 175 [defendant must show that it is reasonably probable a result more favorable would have been reached absent the error].) Moreover, the prosecutor asserted that it was the victim and her female coworker who

10

were the victims of those counts, therefore, the prosecutor made an election that excluded the Moreno Valley insurance office as the "entity" to whom the calls were made.

2. *Convictions for Making Criminal Threats*

The First Amended Information charged defendant with communicating a threat to the victim on October 9, 2010, November 12, 2010 and November 19, 2010. It also charged defendant with communicating a threat to the victim's mother on December 6, 2010. The jury was instructed as to these counts, in pertinent part, that defendant "willfully threatened to unlawfully kill . . . [the victim] and/or [the victim's mother]" and that "the threat actually caused [the victim] and/or [the victim's mother] to be in sustained fear for their own safety or for the safety of her immediate . . . family" which included parents and children.

In addition to a recording of the annoying/harassing calls mentioned above which defendant made to the Moreno Valley insurance office, the jury also heard a recording of a call to the office which the victim answered, during which defendant said to her in Spanish two times that he was going to kill her. The victim testified that the first call defendant made during which he threatened her occurred on October 9, 2010. The jury also heard another recorded call to the Moreno Valley insurance office which the victim answered during which defendant said, in Spanish, that he was going to kill the victim, calling her a bitch. The victim testified that defendant threatened her life a second time on November 12, 2010. The jury also heard another recorded call to the Moreno Valley insurance office which the victim answered, during which defendant called her a fucking

11

whore and said, in Spanish, that he was going to kill her mother, whom he named. The victim testified that defendant threatened to kill her mother on November 19, 2010. The victim testified that two or three separate times defendant threatened to kill her. The victim testified that either in regard to the first call or in regard to all three calls,[6] the result was that she felt sick to her stomach, confused, worried and scared. As to the latter, she explained that defendant was crazy and she did not know if he would actually kill her or he was just saying that he would but she was afraid he would actually hurt her or try to kill her. She testified that she told the Moreno Valley insurance office owner/manager about the threats because she was afraid to walk out to her car and her male coworker would walk her to her car almost every day for two months because she didn't know if something was going to happen to her. She also testified regarding the calls during which defendant threatened to kill her that afterward she would walk away, cry and be shaken. Beginning in September or October, a police detective came into the Moreno Valley Insurance office and the victim gave her a copy of all the calls that were recorded, which included the November 19 call.

In reference to *all* of the calls from defendant, the victim's female coworker testified that sometimes the victim would cry or be terrified or not know, depending on what had been said during the call. The victim's male coworker testified, regarding *all* the calls from defendant that the victim took, that the victim turned pale and started

---

[6] We say this because it cannot be determined with certainty whether the victim was referencing all three calls or just the first one.

12

crying hysterically. He added that after a couple of weeks of this, he began answering most of the calls himself. He also testified that he had to walk the victim to her car every day for a week or if he had to stay late, because the victim had been threatened with bodily harm, and, thereafter, the victim parked in front of the Moreno Valley insurance office.

The victim's mother testified that she had known defendant, having conversed with him on three prior occasions, during one of which he had borrowed her car at her home.[7] On the day the victim was fired from defendant's insurance agency, the victim's mother had watched as the out of control defendant yelled profanities at the victim and threatened to call the police, while accusing the victim of stealing company property, which was unfounded, in the presence of other employees. At the time, the victim lived with her mother. On December 6, 2010, the mother received a phone call at *her* place of employment, during which the caller, who claimed to be the mother's cousin, told the mother that "we're" going to kill the victim and advised the mother to tell the victim not to go to work because "we're" going to kill her and accused the victim of being a "narc." This concerned and frightened the mother, who thought that the victim was in danger, and she immediately called the victim at the Moreno Valley insurance office to make sure the victim was alright. She testified that she told the victim that she had just gotten a

---

[7] On this occasion, they spoke long enough for her to discover that his family came from the same place in Mexico as her family. She testified that she was "getting to know him on a personal level . . . ."

13

phone call threatening the victim's life. After speaking with her own father, the victim and the victim's female coworker, the mother concluded that defendant had been the caller. The detective testified that the mother had reported the call to the detective that day. The victim testified that same day, she went to the police department and reported this call.

The prosecutor argued to the jury that the criminal threats charge in count 1 was the October 9, 2010 threat to kill the victim, the charge in count 2 was the November 12 threat to kill the victim, the charge in count 3 was a threat on November 19, 2010 to kill the victim and count 4 was the December 6, 2010 call to the victim's mother, during which defendant threatened to kill the victim. While the prosecutor misspoke as to count 3, in that it involved a threat *communicated to the victim*, during which *the mother* was threatened, but the victim was not, defense counsel did not object.

Defendant here concedes that there was sufficient evidence that the victim experienced sustained fear for herself or a family member, as required by section 422, as to the October 9 and November 11 calls, based on her testimony that those threats made her fearful and her male coworker had to walk her to her car because of her fear. However, defendant asserts, the evidence was insufficient to prove sustained fear as to the November 19 call because there was no evidence that the victim was in sustained fear for her mother or that she even communicated the threat to her mother. However, the jury could reasonably have interpreted the victim's testimony that she was sick to her stomach, confused, worried and scared as a result of *all* of defendant's calls, including

14

the one on November 19, during which he threatened her mother. Moreover, the victim testified that it was not until her mother had been threatened that she filed a report at the police department.[8] This threat was only eight days after the November 11 threat to the victim's life and logic dictates that if, as defendant concedes, the victim was in sustained fear for her own safety due to the November 11 threat, she would be in sustained fear for her mother on November 19. She lived with her mother at the time. It was apparent from their testimony that the two were close.[9] Additionally, the victim's female coworker's testified that the victim would cry or be terrified or not know, depending on what was said during the call, in relation to *all* of the calls defendant made, not just to those that involved threats to the victim, herself. The victim's male coworker's testimony that the victim turned pale and cried hysterically following calls related to *all* the calls, and not just those during which she, herself, was threatened. Finally, the victim reported all the recorded calls to the police detective and gave her the recording, which included this call. Therefore, there was sufficient evidence that the victim was placed in sustained fear for her mother due to the November 19 call.

---

[8] The victim was incorrect. She did not report to the police until after defendant had called her mother and threatened the victim. However, the victim's testimony in this regard, albeit incorrect, indicated her reaction to the threat directed at her mother.

[9] In addition to cohabitation, it was the victim's mother who drove the victim to defendant's insurance agency to pick up her personal belongings after defendant fired the victim in July 2009. During the five months the victim worked for defendant, the mother visited the victim at the agency and joined her daughter and her daughter's fellow employees for lunch. The mother had been to the agency a sufficient number of times to learn the names of all of the victim's coworkers.

As to defendant's assertion that there was insufficient evidence of sustained fear due to the December 6 call to the victim's mother, defendant ignores the mother's testimony that the call frightened her and that she "th[ought] that [the victim] was in danger." Instead, he focuses on the mother's initial testimony that before she figured out it was defendant calling, she called the victim at her office because she wanted to know if the victim was okay or if this was a "terrible prank." However, this does not detract from the mother's other testimony that she was frightened, she feared the victim was in danger, she immediately called the victim out of concern and she reported the call to the police and so did the victim. Defendant knew where the mother worked.

Defendant also contends that the trial court had a sua sponte duty to instruct the jury that it could convict him of the lesser included offense of attempting to make a criminal threat based on the November 19th and December 6th calls because there is substantial evidence that the victim was not in sustained fear due to the November 19th call and her mother was not in sustained fear due to the December 6th call. (See *People v. Verdugo* (2010) 50 Cal.4th 263, 293.) For reasons already expressed, we disagree. For the same reasons, even if we concluded that the trial court erred in failing to give instructions on attempted threats, there is no reasonable probability that the jury would have convicted him of this lesser offense. (See *Breverman, supra,* 19 Cal.4th at pp. 142, 176, 177.)

## DISPOSITION

16

The convictions for counts 8 and 9 are reversed, as are their concurrent six month sentences, and the trial court is directed to omit reference to them in the minutes of the sentencing hearing, if the prosecutor elects not to retry defendant for them.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

RICHLI
J.

MILLER
J.

17