Filed 6/29/15  P. v. Bailey CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C076863 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F08374) |
| v. | |
| LARRY EDWARD BAILEY, | |
| Defendant and Appellant. | |

A jury found defendant Larry Edward Bailey guilty of assault with a deadly weapon (a motor vehicle) (Pen. Code, § 245, subd. (a)(1)—count one)[1] and leaving the scene of an injury accident (Veh. Code, § 20001, subd. (a)—count two).  Defendant admitted a strike conviction (§§ 667, subds. (b)-(i), 1170.12), three prior serious felony convictions (§ 667, subd. (a)), and five prior prison terms (§ 667.5, subd. (b)).  He was sentenced to state prison for 28 years consisting of double the upper term of four years on

_____

[1]  Undesignated statutory references are to the Penal Code.

1

count one, 15 years for the prior serious felonies, and five years for the prior prison terms. Sentence on count two was stayed pursuant to section 654.

On appeal, defendant contends the trial court erred prejudicially when it denied his request to instruct the jury with CALCRIM No. 306 on the prosecution's late discovery of a police interview of a percipient witness. We shall affirm.

## FACTUAL BACKGROUND

### *Prosecution Case-in-chief*

In December 2013, victim Matthew Stewart was homeless and evidently lived in a department store parking lot on Florin Road in Sacramento. Stewart knew defendant through defendant's girlfriend, Susie Wakai. Defendant and Wakai were homeless and lived in his silver half-ton pickup truck.

On December 18, 2013, defendant and Stewart got into an altercation about money that Stewart owed defendant for the purchase of a bottle of whiskey. Store employees called the police but defendant left the scene before they arrived.

The following day, Stewart used a friend's cellular telephone to call 911 and report that the people from the previous day's incident were threatening him while traveling up and down Florin Road in a silver pickup truck. Stewart reported that the driver was "Sampson," the name by which Stewart knew defendant.

Stewart was talking to the 911 operator as he crossed the street. An unknown male left defendant's truck and began chasing Stewart while threatening to strike him with a tire iron. Then the attacker returned to the truck. Shortly thereafter, defendant "floored" the accelerator and the truck struck Stewart. Stewart told the dispatcher that defendant "just ran [him] over." Stewart could see clearly that defendant was driving the truck and that Wakai was in the back seat.

Stewart testified that the truck hit him "on [his right] side." The impact spun him around and caused him to fall to the ground. He sustained an injured ankle and broken ribs. He clarified that he had not been "run over" but had been struck while the truck was moving at "a good rate of speed."

Stewart identified photographs depicting abrasions to his knees and injuries to his ankle and foot. He testified that he did not seek medical attention because he lacked transportation and devoted his time to finding food. The parties stipulated that, when a prosecution investigator interviewed Stewart, he had not mentioned any broken ribs and confirmed that he had not sought medical attention.

Vianey Ornelas was driving southbound on Franklin Boulevard on the day of the incident. As she approached Florin Road, she saw a man crossing the street with his shopping cart. A large truck sped out of the parking lot traveling northbound in the southbound lanes. The truck drove directly at the pedestrian and hit him. After he fell to the ground, the truck sped back the opposite way and reentered the parking lot. Ornelas stopped to render aid. The pedestrian could not walk and his leg seemed to be hurt. Ornelas called the police.

Wakai testified that she and defendant were living as husband and wife and were residing in his silver 1996 pickup truck. She was intoxicated on gin at the time of the incident and remembered few details other than defendant arguing with Stewart. She remembered speaking to officers after the incident but could not remember the details she had given them.

Wakai testified that two months prior to trial, a Sacramento police officer spoke to her about the incident but she did not remember the conversation.

Sacramento Police Officer Joe Alioto testified that on the day of the incident he responded to a report of an assault with a deadly weapon. A male caller claimed that

someone had run him over using a vehicle. Alioto responded to the area of Franklin Boulevard and Florin Road where he observed Stewart sitting on a curb. Stewart was waiting for the fire department personnel to arrive because he had sustained an injury.

Officer Alioto interviewed Stewart who reported the assault by an unknown person wielding a tire iron. Stewart located a crowbar in the vicinity of the reported assault and Stewart identified the crowbar as the brandished "tire iron." Stewart further reported that, when he later was crossing Franklin Boulevard on foot, the pickup truck driven by defendant tore out of the parking lot from the driveway, northbound in the southbound lanes, directly at him.

Officer Alioto obtained a statement from Ornelas, the witness at the scene.

Using the "Sampson" alias and the suspect's physical description, officers conducted a records check that revealed the assailant possibly was defendant. Officer Alioto obtained a picture of defendant and showed it to Stewart who immediately identified the image as "Sampson."

An officer located the silver pickup truck after it had been driven into a nearby field. Wakai was with the truck. Stewart was brought to the scene where he identified the truck and Wakai.

Sacramento Police Officer Matthew Fetch interviewed Wakai on the day of the incident. Wakai said she had been in the truck with defendant and a man she called "Zig." They encountered Stewart at Franklin Boulevard and Florin Road. Defendant and Stewart exchanged words. Wakai lowered her head and did not see anything that ensued. She did not know whether the truck had struck anything because her head was down. The truck stopped at 24th and Meadowview where the two men fled from the scene.

Two months prior to trial, the Sacramento County District Attorney's office asked Officer Alioto to subpoena Stewart for the trial. Because Stewart was homeless, there

4

was difficulty locating him. During the search, Alioto encountered Wakai whom he had seen near the truck on the day of the incident.

Officer Alioto discussed the incident with Wakai. She said that she had put her head down "when [defendant] was driving the [truck] and tried to hit [Stewart]." Wakai added that she had seen Stewart after the incident and he had not been hurt.

Officer Alioto testified that he did not prepare a supplemental police report of his conversation with Wakai because he thought her information was "along the same lines of what she told the officer who obtained her statement" at the time of the incident.

Yovany Gutierrez testified that while riding northbound on Franklin Boulevard he saw a Black male in a silver pickup truck that was about to hit a pedestrian on the sidewalk. Gutierrez did not see whether the pedestrian was struck but did see that he was on the ground. Gutierrez noted that, when the truck left the parking lot, it was traveling very fast; the tires were squealing and the truck almost hit another car. The pedestrian victim stood up and appeared to be using a cell phone after he was struck. Gutierrez telephoned 911 to report what appeared to be a hit-and-run. Gutierrez and his companion attempted to pursue the truck but eventually lost sight of it.

Salvador Moreno testified that he was driving the vehicle in which Gutierrez was the passenger. While driving on Franklin Boulevard, Moreno heard the squealing of truck tires, saw a silver truck go into oncoming traffic, saw a pedestrian in midair flying into the traffic, and then saw the truck turn and reenter the parking lot. Moreno did not see the truck hit the pedestrian. The truck did not physically run over the pedestrian.

Moreno pursued the pickup truck for 15 minutes. The driver was an African-American male and he had a female passenger. Moreno lost sight of the truck but then saw it parked where the driver had abandoned it and fled on foot.

5

A Sacramento police officer went to the location where Moreno had found the pickup truck. Wakai was the only person remaining with the truck.

Defendant was located and arrested several days after the incident.

*Defense*

The defense rested without presenting evidence or testimony.

## DISCUSSION

### Refusal to Instruct the Jury with CALCRIM No. 306

Defendant contends the trial court erred when it refused his request to instruct the jury with CALCRIM No. 306 (untimely disclosure of evidence) regarding Officer Alioto's conversation with Susie Wakai two months prior to trial.[2] Defendant argues Wakai's statement that he "tried to hit [Stewart]" was the only direct evidence of his intent to assault Stewart with a deadly weapon, and the statement "left little, if any, room for the defense to argue that the incident was not assault." Defendant claims the late discovery was prejudicial because the defense might have sought a different resolution of the case, or strategized for trial with full knowledge of the prosecution case, or questioned Wakai about the second interview, or organized a defense that could neutralize her damaging statement.

### A. *Background*

At the outset of the second day of trial, the prosecutor advised the trial court and defense counsel that Officer Alioto, a prospective prosecution witness who had not yet

---

[2] CALCRIM No. 306 provides in relevant part: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the People failed to disclose [<describe evidence that was not disclosed>] [within the legal time period]. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

6

testified, had just advised the prosecutor that about two months earlier he had been involved in attempting to subpoena the homeless victim, Matthew Stewart. While so engaged, Alioto encountered Wakai in the parking lot near Franklin and Florin. At that point in the proceedings, Wakai was a prosecution witness who had yet to testify and who would later describe herself as defendant's girlfriend or wife. While Alioto was attempting to locate Stewart, Wakai approached Alioto and began to discuss the case.

Officer Alioto asked Wakai whether defendant was still in custody and she said he was. Wakai said she was "upset about everything" that had transpired. She said that on the day of the incident, she was scared and defendant "peeled out of a parking lot trying to hit Mr. Stewart."

As soon as the prosecutor learned this additional information, she tried unsuccessfully to telephone defense counsel at his office. Then she had Officer Alioto come to court early to inform defense counsel of the new information.

As noted, Wakai had given her initial statement to Officer Fetch who, in turn, had written a report based on his interview of Wakai. In that earlier statement, Wakai had indicated that she was in the pickup truck with defendant, who was driving; defendant had argued with Stewart; when defendant drove out of the parking lot, Wakai was scared; she had lowered her head; and she had not seen what was going on. Officer Alioto believed that Wakai had already given her statement to authorities, and he did not consider her later statement to be new or different information.

In response to defense counsel's assertion that Officer Alioto had obtained new and material information, the trial court responded:

"[I]f the prior report says, I was in the car, he pulled out of the parking lot, and then I put my head down, well, it could just be an omission; maybe because they didn't ask, well, did you see where he was pointing? I don't know. I wasn't there. I'm just

7

saying it's not like before she said it was nighttime, and now she's saying it's daytime. They're not necessarily inconsistent statements, as I hear them, because she acknowledged she was in the car that pulled out of the parking lot. Now she's adding the detail, I was upset because he was shooting for him. Now, that's immaterial. I don't disagree. And it's harmful to your side if it's believable. I get all that.

"But to suggest that somehow this is just wholly inconsistent, I'm not sure it is. We haven't heard from the officer who took the original report. You know, the reason I asked those questions is, you know, is there some argument that this was suppressed somehow? Why any officer would suppress information that is helpful to the prosecution, I don't really know. And I don't know if you're making that allegation, but that might make things different.

"But right now it sounds like this was just kind of in passing. It was just information that the officer probably thought the People already had. And, as you say, he actually was the testifying officer at the prelim, but nobody even asked about this witness's statement. He was testifying, I guess, he thought the main case was the victim and not these additional witnesses. So I understand why it is always troubling when you get new information that is not helpful to your side after the trial has begun.

"It seems preliminarily for me, based on the offer that's been made today, that this was an innocent thing that happens, frankly, all the time; where something was not at the formal interview, nobody took the time to write it down, maybe they didn't realize the significance in the scheme of things because they thought it was already part of the case. I don't know. I don't know.

"So I don't know to what extent we're going to need to go into it, but why don't we just hear from the witness to see what she has to say and then see if it's even—the whole thing may be moot."

8

Later, Wakai testified that she and defendant were living as husband and wife in his pickup truck. She was intoxicated on gin at the time of the incident and remembered few details other than defendant arguing with Stewart. She remembered speaking to officers following the incident but could not remember the details she had given them.

Following this testimony, the trial court took the morning recess and noted that the discovery issue "may not, in fact, be moot. And so I thought you might as well address it now." Defense counsel indicated he would object to any attempt to impeach Wakai with the later statement she made to Officer Alioto. The court indicated that the defense position appeared to be that any time an officer had contact with a potential witness, the officer is obligated to reduce that contact to writing. Defense counsel denied that that was his position.

After hearing the arguments of the parties, the court denied the discovery sanction of exclusion, stating, "Counsel, you would agree that everything from every interview doesn't get in a report. And taking your position to its logical conclusion, we would prevent officers from ever testifying to any facts that were not written in their report. And that seems to be not what the law is. [¶] Based on all of this, I'm not going to grant the motion to exclude. While it's certainly late discovery, it was late discovery to both sides. There doesn't seem to be any attempt to mislead, sandbag, hide the ball, anything like that. [¶] This seems like just what happens in virtually every case; that is, you start prepping the witness for testimony. Something then comes up. I might feel differently if [Officer Alioto] had been tasked to go out and reinterview [Wakai], but I might not, I don't know. [¶] But based on the facts as I see them right now, it does not seem to me that this violates our discovery rules because the People did not have possession of this information. While it's certainly hurtful for the defense if the jury would believe the officer that [Wakai] did make this statement, I don't think it's unduly prejudicial within the meaning of—you know, it's not prejudicial in the sense that it is what it is. And it's

9

up to the jury to decide, did she make this prior statement or not. [¶] And you can certainly cross-examine as much as you'd like about the fact that the first time this officer revealed this was today. I mean, absolutely, you have every right to do that. And I'm going to give you as much latitude as you believe you need. Because that's really the issue, is there really a question about whether this happened by virtue of how it came out. So I'll give you full latitude."

When Wakai resumed testifying, she continued to state that she had no recollection of what she had told investigating officers after the incident. When asked if she had told Officer Alioto more recently that she had been "just so scared the day [defendant] tried to hit [Stewart] with the truck," she denied ever having said that.

Later, Officer Alioto testified about his conversation with Wakai two months prior to trial. Alioto impeached Wakai, stating: "She told me that as the incident was happening, she admitted that she put her head down, and she said that she put her head down when [defendant] was driving the car and tried to hit [Stewart], is what she told me." Thereafter, the defense cross-examined Alioto extensively.

At the bench conference on jury instructions, defense counsel requested "a late discovery instruction" with respect to Wakai. The court replied, "As I think I indicated before, I don't think that that would be warranted. I think the jury fully understands how that came up. I intentionally gave you very broad latitude to cross-examine, so I'm not going to give that instruction."

## B. *The Law*

Section 1054.1, subdivision (f) provides in relevant part: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or *if the prosecuting attorney knows it to be in the possession of the investigating agencies*: [¶] . . . [¶] (f) Relevant *written* or *recorded* statements of witnesses or *reports of* the

10

statements of witnesses whom the prosecutor intends to call at the trial . . . ." (Italics added.)

In *People v. Verdugo* (2010) 50 Cal.4th 263 (*Verdugo*), our Supreme Court addressed the reciprocal discovery statute, section 1054 et seq. "Section 1054.1 . . . ' . . . requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [*known by*] *the prosecuting attorney . . . to be in the possession of the investigating agencies*." ' [Citation.] Evidence subject to disclosure includes . . . '[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged' [citation] . . . . 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or *immediately if discovered or obtained within 30 days of trial.* [Citation.]' [Citation.] [¶] Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute, 'including, but not limited to, immediate disclosure, . . . continuance of the matter, or any other lawful order.' (§ 1054.5, subd. (b).) The court may also 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.' (*Ibid*.) A violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836." (*Verdugo*, *supra*, 50 Cal.4th at pp. 279-280, italics added.)

### C. *Defendant's Contention*

Defendant claims section 1054.1, subdivision (f) compels disclosure to the defense of "the statements of prosecution witnesses," and the prosecution's "failure to provide timely notice of Officer Alioto's interview with Wakai was a clear violation of" subdivision (f). We disagree.

Section 1054.1, subdivision (f), applies to relevant "*written* or *recorded* statements of witnesses or *reports of* the statements of witnesses whom the prosecutor intends to call

11

at the trial . . . ."  (Italics added.)  Here, Wakai's statement to Officer Alioto was not written or recorded.  Thus, only Alioto's oral "report" to the prosecutor "of" Wakai's statement is at issue.

Prior to trial, Officer Alioto's report of Wakai's statement was not "in the possession of the prosecuting attorney," and *the prosecutor did not know that Alioto had obtained the statement*.  (§ 1054.1; *Verdugo*, *supra*, 50 Cal.4th at pp. 279-280.)  Thus, the prosecutor's failure to disclose the statement to the defense prior to trial was not a violation of section 1054.1.

Once the prosecutor learned of Wakai's statement on the second day of trial, she had a duty to disclose it " 'immediately' " because it had been " 'discovered or obtained within 30 days of trial.' "  (*Verdugo*, *supra*, 50 Cal.4th at pp. 279-280.)  That is exactly what the prosecutor did.  As soon as she learned the additional information, she tried unsuccessfully to telephone defense counsel at his office and then she had Officer Alioto come to court early to inform defense counsel of the new information.  There was no discovery violation and no basis for the court to give CALCRIM No. 306.

In any event, there was abundant evidence that defendant drove the wrong way in the face of oncoming traffic at "a good rate of speed" in the direction of Stewart.  There was no evidence that the truck malfunctioned or that defendant made a mistake while operating the vehicle.  Under these circumstances, the most logical inference is that defendant drove at Stewart with the intent to hit him.  Wakai's statement that defendant had tried to hit Stewart was cumulative to this evidence.  It is not reasonably probable that any juror who disbelieved or questioned the eyewitnesses' testimony resolved the case in favor of the prosecution based on Wakai's subsequent oral statement to Officer Alioto.  Thus, there is no reasonable probability that defendant could have fared any better had the late discovery instruction been given.  (*Verdugo*, *supra*, 50 Cal.4th at pp. 279-280; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant's other claims of prejudice (e.g., that the defense might have sought a different resolution of the case or presented a different defense) are based on the alleged discovery violation rather than the denial of the jury instruction. Our conclusion that there was no discovery violation makes it unnecessary to consider these issues.

**DISPOSITION**

The judgment is affirmed.


                                        BUTZ            , J.



We concur:



     RAYE            , P. J.



     RENNER          , J.


13